GABRIEL, EDUARDO, CECILIA y MARGARITA CAPÓ CINTRÓN, ET AL., demandantes y apelados, *v.* A. HARTMAN Y COMPAÑÍA, PALMIRA, IDALIA, CARLOS R. y CHLORIS McCORMICK MURDOCK, ésta por sí y como madre con patria potestad sobre su menor hija AXELINA McKINLEY MÚRDOCK, ET AL., demandados y apelantes.

Núm. 7529.—*Sometido:* Noviembre 21, 1939. *Resuelto:* Junio 28, 1940.

*Jorge L. Córdova* y *Carlos J. Torres,* abogados de los apelantes; *José A. Poventud* y *Eduardo Capó Cintrón,* abogados de los apelados.

El Juez Asociado Señor De Jesús emitió la opinión del tribunal.

En pleito seguido en la Corte de Distrito de Guayama por doña Rosario Cintrón Sánchez viuda de Capó contra la sociedad mercantil A. Hartman & Co., se dictó sentencia el 27 de septiembre de 1921 a favor de la demandante declarándola dueña de dos fincas de 42 y 38 cuerdas de terreno, respectivamente, que por varios años antes del primero de junio de 1918, fecha en que fué emplazada la demandada, venía ésta detentando contra la voluntad y a pesar de los distintos requerimientos de la demandante. La indicada sentencia fué confirmada por este tribunal el 26 de febrero de 1925 (*Cintrón* v. *A. Hartman & Co.*, 33 D.P.R. 1070) y por la Corte de Circuito de Apelaciones para el Primer Circuito el 8 de junio de 1926 (12 F. (2d) 649).

Fallecida doña Rosario Cintrón el 24 de enero de 1927 y antes de que transcurriera un año de haberse dictado la sentencia de la Corte de Circuito de Apelaciones que puso fin al pleito de reivindicación, allá por el 28 de mayo de 1927 sus herederos testamentarios instaron este pleito en reclamación de los frutos percibidos por la demandada y los cuales los demandantes o su causante hubieran podido percibir durante el tiempo en que la sociedad demandada poseyó de mala fe las expresadas fincas, a saber, desde antes del primero de enero de 1917 hasta el 25 de junio de 1920 (demanda original enmendada, párr. 8, legajo de sentencia, pág. 5).

Parece conveniente aclarar aquí que la reclamación de frutos se limitó hasta el 25 de junio de 1920, a pesar de que la sentencia de la Corte de Circuito que puso fin al pleito de reivindicación fué dictada el 28 de junio de 1926, debido a que estando aún pendiente el pleito de reivindicación, dichas fincas fueron vendidas por A. Hartman & Co. a otra entidad.

El presente pleito en reclamación de frutos fué dirigido contra la sociedad mencionada, y alegándose que la misma carecía de bienes, fueron también demandados sus socios, los

esposos de dos de las socias, y los herederos de los socios fallecidos, doña Adelina o Axelina Murdock de McCormick y doña Sara Noble Ruiz de McCormick. Se solicitó sentencia contra todos los demandados mancomunada y solidariamente por la cantidad de $101,710 en que estimaron los demandantes los frutos percibidos o podidos percibir, con imposición de costas a los demandados.

Previa autorización de la corte se radicó el 14 de junio de 1933 una demanda complementaria cuyas alegaciones no es preciso reseñar a los fines de esta opinión.

Después de diversos incidentes y de la celebración de un juicio durante los días 28 de marzo, 11 y 12 de septiembre, 11 y 25 de octubre, 8 y 29 de noviembre, y 13 y 20 de diciembre de 1935, y 24 y 31 de enero de 1936, la misma Corte de Distrito de Guayama dictó sentencia el primero de septiembre de 1936, aclarada dos días después a moción de los demandantes, por la cual se condenó a los demandados a pagar mancomunada y solidariamente a los demandantes la suma de $26,958.26 como importe o valor neto de los frutos producidos por las fincas anteriormente mencionadas, más las costas y honorarios de abogado de los demandantes, que fueron fijados en la cantidad de $7,000.

Contra dicha sentencia apelaron los demandados Palmira McCormick Murdock y su esposo Rafael Shuck; Chloris McCormick Murdock por sí y como madre con patria potestad de su hija menor de edad Axelina McKinley McCormick, Idalia McCormick Murdock y su esposo Enrique Calimano Díaz, y Carlos R. McCormick Murdock.

Los apelantes han presentado dos alegatos separadamente, uno a nombre de Palmira McCormick Murdock suscrito por el Lic. Jorge L. Córdova, y el otro a nombre de Chloris, Idalia y Carlos R. McCormick Murdock, Enrique Calimano y Axelina McKinley McCormick, suscrito este último por el letrado Carlos J. Torres.

Los errores señalados en uno y otro alegatos serán considerados conjuntamente en el curso de esta opinión.

Sostienen los apelantes representados por el Lic. Carlos J. Torres que la corte inferior erró al ordenar que se eliminaran de la contestación a la demanda los párrafos 3, 4, 5 y 6 de dicha alegación, que brevemente expuestos dicen así:

(3) Que de recaer sentencia contra los demandados, debe limitarse a $300 anuales, que fué el canon que el arrendatario de la finca, don Genaro Cautiño Insúa, pagó a A. Hartman & Co. durante el tiempo comprendido entre el mes de junio de 1917 y el primero de enero de 1920.

(4) Que la acción sobre reclamación de frutos está prescrita.

(5) Que el derecho a la reclamación de frutos fué renunciado por la causante de los demandantes al no solicitarlos dentro de la acción reivindicatoria.

(6) Que no habiéndose declarado en la sentencia dictada en el pleito de reivindicación la existencia de mala fe por parte de A. Hartman & Co., existe a su favor la presunción de ser poseedora de buena fe y por consiguiente no viene obligada a la devolución de frutos. (Alegato, págs. 8 a 10.)

El artículo 104 del Código de Enjuiciamiento Civil, como regía al iniciarse el pleito de reivindicación y como rige en la actualidad, en lo pertinente prescribe:

"Art. 104. El demandante podrá acumular (en inglés dice *may join*) varias acciones en una misma demanda, cuando todas se deriven de:

"1.    .    .    .    .    .    .    .

"2. Reclamaciones para recobrar determinada propiedad inmueble, con o sin resarcimiento de perjuicios por retención de la misma, o por daños causados en ella, y por sus rentas y utilidades.

"    .    .    .    .    .    .    ."

El citado precepto legal no permite otra interpretación que no sea la de que es potestativo en el demandante la acumulación de acciones. Siendo potestativo el acumular las acciones y tratándose de dos distintas cuales son la de reivindicación y la de reclamación de frutos, que aunque subsidiaria la segunda de la primera es independiente de ella, al hacer uso la demandante en el pleito de reivindicación del derecho de no acumular la acción reivindicatoria con la de

reclamación de frutos, no implica en manera alguna la renuncia del derecho a establecer esta última acción separadamente.

De manera, pues, que el demandante tiene la siguiente alternativa: acumular la acción subsidiaria de reclamación de frutos a la principal de reivindicación, o instituir esta última acción solamente y en pleito independiente reclamar los frutos; pero en este último caso la acción o reclamación de frutos no puede establecerse hasta que no exista una sentencia firme a favor del demandante en el pleito de reivindicación. Esto es así porque dependiendo el derecho a los frutos de que el reclamante sea dueño de la finca que los produjo, hasta que no se establezca tal condición en el demandante, no tiene derecho a reclamarlos. *Locke* v. *Peters*, 65 Cal. 161.

En el caso de *New Orleans* v. *Gaines*, 82 U.S. 624, citado con aprobación por esta corte en el de *Ruiz* v. *Mario Mercado e Hijos*, 38 D.P.R. 586, 592, interpretando preceptos iguales del Código Civil de Louisiana, se dijo por el más alto tribunal nacional:

"Resta por considerar la cuestión relativa a la prescripción. Se alega como error el no haberse declarado que el caso había prescrito, cuestión que se suscitó en oposición a la reclamación de todas las rentas y utilidades que se habían acumulado durante más de tres años con anterioridad a la fecha en que se entabló la acción. El Código Civil enumera como una de las causas de acción que están sujetas a prescribir a los tres años 'las acciones por el retraso en el pago de arrendamientos, anualidades y pensiones alimenticias, o del alquiler de muebles o inmuebles.' (Artículo 3503.) 'En general, todas las acciones personales excepto las arriba enumeradas, prescriben a los diez años, si estuviere presente el acreedor, y a los veinte años, si estuviere ausente.' (Artículo 3508.)

"Estos artículos no gobiernan el presente caso. Ellos se refieren a acciones que la parte tenía el derecho legal de entablar. No son aplicables a derechos como el presente, que resultan de la determinación de otra acción. Hasta tanto se resolviera el pleito principal, no había aquí ninguna causa de acción para recobrar las utilidades no percibidas por el dueño (*mesne profits*). No podía sostenerse una acción especial para recobrarlas hasta que se

determinara judicialmente el título de la propiedad. Este caso más bien se rige por el capítulo que trata 'Del derecho de accesión respecto al producto de los bienes.'

" 'Las producciones de la tierra, ya sean espontáneas o industriales, pertenecen al propietario por accesión.'

" 'Los frutos de la cosa pertenecen al dueño de la misma, aun cuando hayan sido producidos mediante la industria y el trabajo de una tercera persona o por semillas regadas por ella, previo reembolso por el dueño de los gastos en que esa tercera persona haya incurrido.'

" 'Los frutos de la cosa no pertenecen al simple poseedor, y deben ser devueltos juntamente con la cosa al propietario que la reclama, a menos que la posesión hubiese sido tenida de buena fe.'

"Estrictamente hablando, no sólo no había causa de acción, sino que tampoco había derecho a las rentas no percibidas por el dueño hasta tanto se dictara sentencia en el pleito original."

En el mismo sentido se pronuncia Manresa cuando dice:

". . . no hay, pues, base que pueda servir de fundamento para la prescripción, hasta que llega el momento de poder ser ejercitada, o sea, desde que es eficaz la sentencia que declara la obligación que ha de ser exigida . . ." 12 Manresa, "Comentarios al Código Civil", 3a. ed., año 1907, pág. 879.

Ya hemos visto que el pleito de reivindicación quedó definitivamente resuelto por la Corte de Circuito de Apelaciones el 8 de junio de 1926 y que la demanda en reclamación de frutos fué radicada el 28 de mayo de 1927, es decir, cuando todavía no había transcurrido un año desde que los demandantes estuvieron en aptitud legal de instar esta acción.

Sea cualquiera el término de prescripción que deba aplicarse, forzoso es concluir que al radicarse la acción de reclamación de frutos no había expirado el término de prescripción más corto, cual es el de un año. Es evidente que la acción no estaba prescrita cuando fué ejercitada.

■ Habiéndose establecido la acción reivindicatoria solamente, la buena o mala fe de la demandada no estaba en controversia y ningún pronunciamiento pudo legalmente hacerse en la sentencia que en dicho caso se dictó a favor de

la demandante. Por consiguiente, la ausencia de tal pronunciamiento ninguna inferencia o presunción crea a favor de la buena fe de la demandada.

■ En el pleito de reivindicación quedó plenamente probado que la demandada A. Hartman & Co. poseía las dos fincas de la demandante sin título alguno. Es también un hecho incontrovertido que dichas fincas estaban inscritas a favor de la demandante, la de 38 cuerdas desde el año 1891, al folio 2 del tomo 71 de Guayama, finca núm. 799, inscripción 33; y la de 42 cuerdas, adquirida desde el año 1868, al folio 154, del tomo 39 de Guayama, finca núm. 1940.

El artículo 363 del Código Civil (ed. 1930) define al poseedor de buena fe diciendo que es el que ignora que en su título o modo de adquirir existe vicio que lo invalide y que el de mala fe es el que se halla en el caso contrario. Comentando este mismo precepto en el Código Civil español, bajo el número 433, dice Manresa:

" 'Se reputa poseedor de buena fe,' dice el artículo 433, 'el que ignora que en su título o modo de adquirir existe vicio que lo invalide.' Según esta definición, es indispensable para que exista buena fe: (1) título o modo de adquirir; (2) vicios en dicho título o modo; (3) ignorancia de esos vicios por el poseedor, y como inmediata consecuencia, creencia fundada de pertenecerle la cosa o el derecho que posee." 4 Manresa, "Comentarios al Código Civil Español", edición 1910, pág. 93.

Si como hemos visto A. Hartman & Co. no tenía título alguno a las fincas en cuestión, si como demuestra la evidencia, las fincas estaban inscritas a nombre de la causante de los demandantes desde el año 1891 la de fecha más reciente, y si consideramos además que con anterioridad al año 1917 doña Rosario Cintrón, personalmente y además por conducto de sus hijos Gabriel y Eduardo Capó y de su abogado Lic. Francisco Parra Capó, hizo reiteradas gestiones cerca de los socios gestores de la demandada para que le devolvieran la finca por ser de su exclusiva propiedad, ¿cómo pueden ellos alegar con éxito su buena fe?

Se arguye que en la sentencia que dictó este tribunal confirmando la de la Corte de Distrito de Guayama en el pleito de reivindicación, dos de sus jueces disintieron y la sentencia fué dictada sin costas, y se sostiene que estas dos circunstancias son demostrativas de que este tribunal no encontró mala fe en la posesión de los demandados. Como dejamos ya consignado, la buena o mala fe en la posesión de la demandada no estaba en controversia en el pleito de reivindicación. La única cuestión que allí se debatía era si las fincas pertenecían a la demandante o a la demandada. Por consiguiente, al exonerarla del pago de costas, no pudo estar en la mente del tribunal si la posesión de la demandada era de buena o de mala fe. Podría alegarse en contrario que la corte de distrito condenó en costas a la demandada y la del Primer Circuito de Apelaciones no se limitó a confirmar la de este tribunal, sino que impuso las costas a la apelante (op., pág. 652), y refiriéndose al disentimiento de los dos jueces de este tribunal, se expresó así:

"Es cierto que dos jueces disintieron; pero esta corte no tiene el beneficio de una opinión de ellos demostrativa de los fundamentos de su disenso." (Op. pág. 651.)

Resulta de la prueba que en el período por el cual se reclaman frutos, las dos fincas se hallaban arrendadas por A. Hartman & Co. a Genaro Cautiño Insúa por un canon total de $300 anuales. Arguyen los apelantes que en el caso de recaer sentencia contra los demandados, su importe debe limitarse a $300 anuales, que es lo que recibió la demandada como frutos de la finca a virtud del arrendamiento. La apelante Palmira McCormick es algo más generosa cuando dice:

"Sostenemos, por lo tanto, que la única compensación a que tienen derecho los demandantes en este caso es un canon razonable, bien el de $300 anuales que percibió A. Hartman & Co., bien el de $960 anuales que representa el 6 por ciento del valor de las ochenta cuerdas por las dos anualdidades 1919 y 1920, posteriores a la existencia de mala fe técnica de parte de A. Hartman &

Co., o sea desde la citación de la demandada en el pleito de reivindicación.'' (Alegato impreso de la apelante Palmira McCormick, pág. 29.)

No incurramos en el error de creer que los frutos que el poseedor de mala fe debe devolver son los realmente percibidos por él. Pudiera darse el caso de que el poseedor tuviera la finca completamente abandonada y por consiguiente nada le produjese, y en ese caso, según la interpretación propuesta por los apelantes, como nada les produjo la finca, nada tendrían que devolver. Esta cuestión la trata Scaevola en la siguiente forma:

"Pudiera suceder que el poseedor de mala fe, convencido de su desventajosa posición y temeroso de que el legítimo dueño de la heredad poseída ejercitare la acción reivindicatoria, dejare aquélla completamente abandonada y sin cultivo. En tal caso, el abono de frutos comprenderá *la totalidad de los que el fundo hubiese podido producir, habida consideración a las condiciones del año agrícola y al solícito cuidado de un buen padre de familia.*'' 8 Scaevola, Código Civil, 485. (Bastardillas nuestras.)

El criterio que debe aplicarse para determinar lo que por concepto de frutos debe devolver el poseedor de mala fe, lo establece el artículo 384 del Código Civil (ed. 1930), que en lo pertinente dice:

"Art. 384. El poseedor de mala fe abonará los frutos percibidos *y los que el poseedor legítimo hubiera podido percibir*, y sólo tendrá derecho a ser reintegrado de los gastos necesarios hechos para la conservación de la cosa. . . .''

Como dice Sánchez Román en sus "Estudios de Derecho Civil Español'', tomo 3, pág. 445, "la doctrina tiene un carácter de penalidad civil evidente, con el objeto de castigar la mala fe del poseedor.''

Sostiene Manresa que *"los podidos percibir* (refiriéndose a los frutos) son los que debiera haber producido la cosa.'' (4 Manresa, ob. cit., pág. 259.)

En el caso de autos, los frutos percibidos por la demandada, como antes hemos dicho, eran los cánones de arren-

damiento que le pagó el Sr. Cautiño, o sea $300 anuales durante el tiempo por el cual se reclaman frutos; pero la evidencia concluyentemente demuestra que lo que realmente produjeron las fincas mientras las cultivó el Sr. Cautiño durante los años en cuestión, excedió de $17,000, como veremos más adelante. Si esa cantidad fué lo que en realidad produjeron las fincas, no cabe duda que la misma representa el valor de los frutos que el poseedor legítimo, la causante de los demandantes, *hubiera podido percibir*.

No erró la corte sentenciadora al ordenar la eliminación de los párrafos 3, 4, 5 y 6 de la contestación y actuó correctamente a nuestro juicio, al adoptar como medida de los frutos a devolver los que la finca realmente produjo en poder del Sr. Cautiño durante los años de 1917 al 1920, ambos inclusives.

Ahora bien, alegan los apelantes que la corte inferior erró al calcular en $26,958.27 el producto neto de las cosechas **durante los años 1917 a 1920** inclusives. Argumentando este señalamiento de error se dice en el alegato impreso, de la apelante Palmira McCormick, página 31 *et seq.*, que la corte *a quo* erró al calcular .el producto del azúcar producido durante los años 1917 al 1920, ambos inclusives, a base de la lista de precios del *Exhibit* 13 (debe ser *Exhibit* 12) de los demandantes apelados y no de acuerdo con el *Exhibit* 11, también de los demandantes apelados.

El *Exhibit* 11 de los demandantes, que empieza al folio 222 del volumen 2 de la transcripción de evidencia, es una copia certificada por el Secretario Ejecutivo del Trigésimo-cuarto Informe Anual del Gobernador de Puerto Rico en la parte que se titula: "Commerce of Puerto Rico 1933–1934, Sugar Exports 1903–1934", del que resulta la cantidad de azúcar que la Isla de Puerto Rico ha exportado desde el 1903 al 1934, ambos inclusives, con el precio por tonelada en el mercado de Nueva York. De dicho *Exhibit* 11 resulta que el precio a que se vendió el azúcar exportado de Puerto Rico en el año 1917 fué el de $110.47 por tonelada, o sea

$5.523 por quintal; en el 1918, $122.81 por tonelada, o $6.14 por quintal; en el 1919, $136.77 por tonelada, o $6.838 por quintal, y en el 1920, a $235.88 tonelada, equivalente a $11.794 quintal.

Según el *Exhibit* 12 de los demandantes (transcripción de evidencia, volumen 3, pág. 224), que es una estadística del Departamento de Agricultura y Comercio, División de Estadísticas, San Juan, Puerto Rico, en relación con el precio promedio de los azúcares de todas procedencias en el mercado de Nueva York, resulta que el precio promedio en dicho mercado durante los años 1917 al 1920, ambos inclusives, fué el siguiente:

| | |
|---|---|
| 1917 | $6. 228 quintal |
| 1918 | 6. 447 quintal |
| 1919 | 7. 724 quintal |
| 1920 | 12. 362 quintal |

A nuestro juicio, la corte inferior cometió el error que se le imputa. Representando el *Exhibit* 11 el precio promedio del azúcar de Puerto Rico en Nueva York, y tratándose, como se trata en este caso, de determinar el precio a que se vendió dicho azúcar en Nueva York en las fechas indicadas, debió tomarse por base dicho *Exhibit* 11 y no el precio promedio de todos los azúcares vendidos en el mercado de Nueva York a que se refiere el *Exhibit* 12. Es evidente que el *Exhibit* 11 representa con más exactitud que el *Exhibit* 12 el precio del azúcar que produjeron las fincas de los demandantes durante los cuatro años en cuestión. Se arguye por los apelados que el precio pagado por la central a los colonos es el precio promedio del azúcar en el mercado de Nueva York; pero teniendo una estadística que nos indica cuál fué el precio promedio a que se vendió el azúcar de Puerto Rico, esta última es la que sin duda representa el verdadero precio recibido por el Sr. Cautiño. Desde luego que tratándose de una evidencia presentada por los propios demandantes apelados, al aplicarla en su contra, la aceptamos como entera-

mente correcta, pues es de presumir, y de ello no tenemos duda, que de no ser exacta dicha evidencia, los apelados no la hubieran presentado.

De acuerdo con los precios del *Exhibit* 11 el ingreso bruto producido por los azúcares en cuestión es:

| A ñ o | Quintales de Azúcar | Precio por Quintal | Ingreso Bruto |
|---|---|---|---|
| 1917 | 1,804.60 | $ 5.523 | $ 9,966.81 |
| 1918 | 2,046.80 | 6.140 | 12,567.35 |
| 1919 | 1,835.40 | 6.838 | 12,550.46 |
| 1920 | 1,888.60 | 11.794 | 22,274.15 |
| Total | | | $57,358.77 |

De acuerdo con el precio promedio de Nueva York que erróneamente aplicó la corte inferior, el resultado es el siguiente:

| A ñ o | Quintales de Azúcar | Precio por Quintal | Ingreso Bruto |
|---|---|---|---|
| 1917 | 1,804.60 | $ 6.228 | $11,239.05 |
| 1918 | 2,046.80 | 6 447 | 13,195.72 |
| 1919 | 1,835.40 | 7.724 | 14,175.63 |
| 1920 | 1,888.60 | 12.362 | 23,346.87 |
| Total | | | $61,957.27 |

Diferencia entre el precio promedio de todos los azúcares vendidos en Nueva York y el precio promedio de los azúcares de Puerto Rico en el mismo mercado: $4,598.50; pero como la corte inferior erró al calcular el ingreso bruto para el año 1919 en $14,176.63, en vez de $14,175.63, que es lo correcto, tendremos que deducir entonces de la sentencia la cantidad de $4,599.50 que indebidamente fueron condenados a pagar los demandados apelantes.

Alega también la apelada Palmira McCormick que la corte erró al no deducir del ingreso bruto la cantidad de 25 centavos por cada quintal de azúcar por concepto de envase, flete y seguro al mercado de Nueva York, cuya cantidad deducía la central del precio que pagaba al colono.

Arguyen los apelados que los 25 centavos por quintal están incluídos en los gastos de producción sobre los cuales declaró el Sr. Cautiño.

No tienen razón los apelados. Los gastos a que se refirió el Sr. Cautiño no incluyen los 25 centavos del envase, flete y seguro del azúcar. Tomamos de la declaración del Sr. Cautiño:

"P. ¿El gasto máximo, Sr. Cautiño, en el año 1918, en el 18 no, en el 17?

"R. Aquí se gastó menos, de 80 a 90 dólares.

"P. ¿80 ó 90 dólares por qué, por cuerda?

"R. Por cuerda.

"P. ¿Si le pusiéramos 90 el máximo que usted ha mencionado, estaríamos a cubierto a toda posibilidad de error en cuanto a que he incluído la cantidad máxima por cuerda de gastos totales?

"R. Creo que sí.

"P. Noventa dólares por cuerda. Sr. Cautiño, ¿entre esos gastos totales, qué partidas de gastos incluye usted?

"R. La partida de cultivo.

"P. ¿Qué más?

"R. Gastos semanales.

"Lic. Soto Gras:

"P. ¿Cómo, no entiendo, cultivo?

"R. Cultivo, el capataz que tenía en la hacienda, su semanal.

"Lic. Torres:

"P. ¿Pero a qué partida se carga el capataz?

"Lic. J. A. Poventud:

"P. ¿Esos gastos incluyen entre otros . . .?

"Lic. Soto Gras:

"P. Capataz, ¿qué más?

"R. Y todos los gastos concernientes al cultivo de la caña."
(Volumen 1 de la transcripción de evidencia, págs. 123-124.)

\* \* \* \* \* \* \*

R. ¿Era en qué gasté $110 por cuerda en las 104?

"P. Yo lo único que quisiera es, aunque no me explique cuál es el montante total de gastos de cada partida, que me dijese cuáles son los distintos conceptos que representan ese gasto.

"R. Romper el terreno, cruzar el terreno, sembrar el terreno, desyerbar el terreno y regar el terreno, cultivar el terreno es el

romper, el banquear, todo eso. Eso es lo que se llama cultivo en una siembra.'' (Volumen 1 de la transcripción de evidencia, pág. 159.)

    *       *       *       *       *       *       *

''P. ¿Entonces, según he entendido ahora que acaba de contestarme a una de mis preguntas, los $110 de cultivo no incluyen los gastos de recolección, acarreto y tiro?

''R. No, señor.

''P. ¿No incluyen eso?

''R. No, señor.

''P. ¿Así que ésos son gastos adicionales que se deben sumar a los $110 del cultivo?

''R. No, el corte de caña . . .

''P. ¿Es distinto?

''R. Y el acarreo, ya entra en este cálculo de $110. El corte de caña y el acarreo sí entran en eso.

''P. ¿Y la recolección?

''R. La recolección es el corte y llevarla al chucho.

''P. ¿Entonces está todo incluído?

''R. $110.

''P. ¿En los $110 está todo incluído?

''R. Sí, señor.

''P. ¿Desde que se empezó a virar hasta que usted entregó la caña en la Central Machete?

''R. No, en el chucho porque de la Tuna a la Central Machete va en vagones que paga la central, los 41 centavos por tonelada.'' (Volumen 1 de la transcripción de evidencia, págs. 168-169.)

De la declaración transcrita resulta evidente que el Sr. Cautiño no tuvo en mente la deducción de 25 centavos por concepto de envase, flete y seguro, apareciendo por el contrario, que se refirió a los gastos de siembra y cultivo, incluyendo acarreto.

Tomando en consideración el número de quintales producido desde 1917 al 1920, ambos inclusives, las cantidades a descontar por concepto de envase, flete y seguro deben ser las siguientes:

| A ñ o | Número de quintales de Azúcar | Total a deducir por envase, flete, y seguro |
|---|---|---|
| 1917 | 1,804.60 | $451.15 |
| 1918 | 2,046.80 | 511.70 |
| 1918 | 1,835.40 | 458.85 |
| 1920 | 1,888.60 | 472.15 |
| Total | | $1,893.85 |

Como el poseedor de mala fe tiene derecho a que se deduzca de los frutos que debe devolver la cantidad por él invertida para producirlos (artículo 382 del Código Civil, edición 1930), procede también deducir del montante de la sentencia la suma de $1,893.85.

Arguye también la apelante Palmira McCormick que la corte erró al calcular los gastos de cultivo, etc., por cuerda, en que incurrió el Sr. Cautiño para producir las cosechas correspondientes a los años 1917 al año 1920 inclusives. La corte calcula dichos gastos en $35,000. Sin embargo, de la declaración del Sr. Cautiño resulta exactamente lo gastado por él en el cultivo de las 70 cuerdas que según él, cultivó de las 80 de que se componían las dos fincas de los demandantes apelados. De su delaración resulta lo siguiente:

| A ñ o | Número de cuerdas | Gasto por cuerda | Total |
|---|---|---|---|
| 1917 | 70 | $110 | $ 7,700 |
| 1918 | 70 | $110 | 7,700 |
| 1919 | 70 | $110 | 7,700 |
| 1920 | 70 | $210 | 14,700 |
| Total | | | $37,800 |

Véase la transcripción de evidencia, volumen 1, páginas 156, 158, 159, 160, 166, 168 y 169.

Como la cantidad que por concepto de gastos dedujo la corte del ingreso bruto fué $35,000, y en realidad dichos gastos ascendieron a $37,800, resulta una diferencia de $2,800 que también debe deducirse del montante de la sentencia.

Deduciendo entonces de los $26,958.27, montante de la sen-
tencia, la cantidad de $4,599.50 a que nos referimos anterior-
mente, por concepto de diferencia de precio entre el mer-
cado de Nueva York de azúcar de todas las procedencias y del
azúcar de Puerto Rico, más $1,893.85, importe de los 25 cen-
tavos que por concepto de envase, flete y seguro, dejó de
deducir la corte y a que antes se ha hecho referencia, más
los $2,800 de diferencia en los gastos de producción, el mon-
tante de la sentencia debe reducirse a la cantidad de
$17,664.92, en vez de $26,958.27 concedidos por la sentencia
apelada.

En cuanto a honorarios de abogado, no tenemos duda
alguna que procede concederlos. El récord es voluminoso;
la transcripción de evidencia consta de tres volúmenes, el
primero de los cuales consta de 507 páginas, el segundo de
317, y el tercero de 523; la celebración del juicio, como hemos
visto al principio de esta opinión, tomó los siguientes días:
28 de marzo, 11 y 12 de septiembre, 11 y 25 de octubre, 8
y 29 de noviembre, y 13 y 20 de diciembre de 1935, y 24
y 31 de enero de 1936; las cuestiones suscitadas son de ver-
dadera importancia y el *standing* profesional del abogado de
los apelados es excelente. Sin embargo, opinamos que la
suma de $7,000, habidas en consideración todas las circuns-
tancias que rodean este caso, es algo exagerada, y opinamos
que debe reducirse a la cantidad de $5,000.

*Por lo expuesto, procede modificar la sentencia apelada,
reduciendo su montante a $17,664.92, y la partida de honora-
rios de abogado a la cantidad de $5,000, y así modificada,
procede confirmarla.*

El Juez Asociado Sr. Wolf está conforme con la mayor
parte de la opinión, pero no con la cuantía de los frutos con-
cedidos que cree debe reducirse.