MANUEL FRANCISCO LLUBERAS ET AL., demandantes, apelados y apelantes, *v.* MARIO MERCADO E HIJOS, demandada, apelante y apelada.

Número 10614.

*Sometido:* 10 de noviembre de 1952. *Resuelto:* 15 de junio de 1953.

*Pedro M. Porrata* y *Charles Cupril,* abogados de la apelante y apelada; *Leopoldo Tormes* y *Luis López de Victoria,* abogados de los apelados y apelantes.

EL JUEZ ASOCIADO SEÑOR MARRERO emitió la opinión del tribunal.

De las tres causas de acción alegadas en la demanda[1] tan sólo nos interesa ahora la segunda, ya que en relación con la primera—en la cual se solicita la reivindicación de dos fincas rústicas, situadas en el Barrio Indios del término municipal de Guayanilla, y de condominios indivisos de una mitad en otras dos—el tribunal a quo dictó en 18 de junio

[1] Los antecedentes de este caso pueden hallarse en las opiniones emitidas por este Tribunal en *Lluberas* v. *Mario Mercado e Hijos,* 55 D.P.R. 41 y en *Mario Mercado e Hijos* v. *Olivieri,* 60 D.P.R. 877. Para la mejor comprensión del mismo es conveniente, sin embargo, hacer constar lo siguiente, tomado en gran parte de dichas decisiones:

Allá para el 5 de abril de 1927 Elvira y Santia Olivieri Commins cedieron en arrendamiento por término de 10 años a Mario Mercado Montalvo las fincas aquí envueltas. En 23 de marzo de 1932 Elvira otorgó escritura de hipoteca voluntaria a favor de Mario Mercado e

de 1945 y de conformidad con la Regla 54 (*b*), (²) sentencia en favor de los demandantes y de la misma no se apeló; y toda vez que respecto a la tercera causa de acción—en la que se solicita por concepto de daños y perjuicios la suma. de $58,440 que los demandantes alegan tendrían que pagar como contribución sobre ingresos sobre la cantidad que se les conceda a virtud de la reclamación que hacen en la. segunda causa de acción—el tribunal sentenciador, a instancias de los demandantes y sin la oposición de la demandada, postergó su resolución.

En la segunda causa de acción, que como antes decimos es la única que de momento nos concierne, los demandantes alegan que las dos fincas y los condominios descritos en la primera causa de acción de la demanda han estado sembrados de cañas de azúcar, pastos y frutos menores desde el 2 de junio de 1937 hasta la radicación de la demanda; que de esos productos la demandada ha disfrutado ilegalmente, de mala fe y a sabiendas de que carecía de título para ello; que después de deducirse los gastos incurridos en

---

Hijos por $41,256.89, y en ella aparecen dos cláusulas que textualmente· copiadas rezan así:

### "SEXTA.

"Si al vencer el contrato de arrendamiento referido en el hecho segundo de este instrumento no se hubieren satisfecho los pagarés hipotecarios, la deudora, sus cesionarios o causahabientes se obligan a imponer a cualquier arrendatario la obligación de deducir de los cánones de· arrendamiento que se convengan las sumas necesarias para el pago de: los intereses adeudados a Mario Mercado e Hijos, y a verificar dicho pago a dicha Sociedad por cuenta de la deudora, según lo convenido en la cláusula cuarta de esta escritura.

(²) La Regla 54 (*b*) dispone:

"*Sentencia en Distintas Etapas.*—Cuando en una acción se presenten varias reclamaciones, *la corte en cualquier etapa de la misma,* al determinar los puntos esenciales de una reclamación específica y de todas las reconvenciones que surjan de la transacción o evento que sean objeto de la reclamación, *podrá dictar sentencia sobre dicha reclamación.* La. sentencia pondrá término a la acción en lo que se refiere a la reclamación así resuelta, y la acción continuará en cuanto a las reclamaciones restantes. . . . ." (Bastardillas nuestras.)

el cultivo y recolección de los mismos, dichos frutos y productos tienen un valor de $72,000; y que han requerido a la demandada el pago de esa cantidad y ésta se ha negado a ello.

Trabada la contienda, fué el pleito a juicio y las partes adujeron copiosa prueba testifical y documental. El tribunal a quo dictó sentencia declarando con lugar la demanda en cuanto a su segunda causa de acción (reclamación de frutos percibidos y que han podido producir las fincas reivindicadas) y condenando a la demandada a pagar a los demandantes la suma de $41,345.56, "por concepto de frutos percibidos por dicha demandada y que han podido producir las fincas y condominios objeto de la reivindicación," con costas y $4,000 para honorarios de abogado de la parte demandante. En apoyo de su sentencia el tribunal sentenciador emitió extensa opinión, en la cual figuran las siguientes conclusiones de hechos:

"1ª Que los demandantes, desde 2 de junio de 1937, son dueños absolutos, en común y proindiviso, de las dos fincas y

---

"SÉPTIMA.

"OPCIÓN DE VENTA Y ARRENDAMIENTO: .No obstante lo expuesto en la cláusula precedente, la deudora, como parte de la consideración de este contrato, conviene con la Sociedad 'Mario Mercado e Hijos' mientras no se salde el crédito hipotecario aquí constituído, en darle preferencia para la venta o arrendamiento, de sus condominios en las fincas 'Indios' y 'Juanita' en igualdad de precio y condiciones. A este fin, la deudora, comunicará mientras no se pagare el crédito hipotecario, por carta certificada a Mario Mercado e Hijos, cualquier proposición de venta o arrendamiento que se les hiciere y dicha Sociedad tendrá un término de treinta días para aceptar o no las proposiciones y durante dicho plazo la deudora no podrá efectuar venta o arrendamiento a otra persona. Caso de venta o arrendamiento en violación de este convenio, 'Mario Mercado e Hijos' tendrá el derecho de retracto contra el comprador o arrendatario, el cual derecho podrá ejercer en el término de treinta días desde la inscripción de la venta o arrendamiento para subrogarse en el lugar, grado y prelación del comprador o arrendatario."

El 23 de agosto de 1933 se otorgó por Elvira y Santia una escritura sobre "División Material de Fincas Rústicas en Comunidad", en la cual se repiten las dos cláusulas que han sido copiadas más arriba y se dividen las fincas pertenecientes a las comparecientes. La aquí demandada dió su consentimiento a la división de la comunidad.

condominios descritos en la primera causa de acción, con título inscrito desde 10 de marzo de 1937 en el Registro de la Propiedad del partido. . . . Sentencia de esta corte (por la 1ra. causa de acción) fecha 23 de agosto de 1945.

"2ª Que los demandantes requirieron insistentemente a la demandada que les entregara las fincas y condominios referidos y ésta siempre se negó a hacerlo . . . y vinieron los bienes a posesión de los demandantes sólo por ejecución que hizo el Márshal de nuestra sentencia, supra, el día 3 de noviembre de 1945.

"3ª Que la posesión material y disfrute por la demandada de las fincas y condominios de autos, desde 2 de junio de 1937 a 3 de noviembre de 1945 fué de mala fe.

. . . . . . . .

"Dada la orientación de la prueba pericial aportada, dirigida casi en su totalidad a establecer más bien las calidades de terreno, los métodos de cultivo y abono y la calidad de las cañas, que la producción en caña, azúcar y dinero para una adecuada fijación de los beneficios producidos o debidos producir; tomando, además, en cuenta el interés de cada parte en hacer que las cifras ofrecidas abonaran en el mayor grado posible sus respectivas pretensiones era necesario que, sin dejar de considerar los análisis y las conclusiones de cada uno de los litigantes, hiciésemos nuestro propio estudio, análisis o investigación.

---

El 9 de mayo de 1933 Mario Mercado e Hijos cedió por escritura pública a la viuda e hijos de José Tous Soto el crédito hipotecario constituído a su favor por Elvira Olivieri Commins. Nada se dijo en esa escritura respecto a la opción de venta a que antes se ha aludido. El 31 de marzo de 1937 las mismas partes otorgaron una escritura de "Ratificación", en la que hicieron constar que en la mencionada escritura de cesión de crédito hipotecario ". . . no se incluiría . . . el derecho o los derechos consignados a favor de Mario Mercado e Hijos . . . reserván-. dose . . . dicha sociedad los derechos y obligaciones dimanados de dicha cláusula durante todo el tiempo en que la citada hipoteca estuviera en vigor." Antes de otorgarse la escritura de "Ratificación", o sea en 25 de febrero de 1937, Elvira había otorgado escritura de hipoteca voluntaria a favor de los aquí demandantes. En ella, luego de describirse los inmuebles, se hace constar que las propiedades están sujetas al contrato de arrendamiento a favor de Mario Mercado e Hijos, así como a una hipoteca voluntaria a favor de esta sociedad; que la compareciente Elvira confiesa deber a los Lluberas la suma de $45,000 y que en garantía de ella constituye hipoteca voluntaria sobre cada una de las fincas que se describen y a la vez designa a Manuel Francisco Lluberas Pasarell apoderado especial para que éste proceda a pagar el crédito original-

"En su consecuencia, hemos utilizado dos factores que de la prueba resultan claramente determinados, como son la cuantía de gastos y el precio del azúcar. Para determinar las cantidades de caña y de azúcar producidos, o debidos producir hemos utilizado como referencia el libro 'La Industria del Azúcar de Caña en Puerto Rico', publicado en septiembre de 1942 por la División de Investigaciones y Estadísticas de la Junta de Salario Mínimo, Gobierno de Puerto Rico, y estadísticas adicionales suministradas por dicha Junta correspondiente a los años de zafra 1942-43 y en adelante. Para las anteriores a 1942 hemos utilizado la Tabla 2 que aparece en la página 18 de dicha obra antes mencionada.

. . . . . . . . . .

"9ª Que los frutos de las fincas y condominios aquí en litigio desde junio 2 de 1937 a noviembre 3 de 1945 en que las

mente existente en favor de Mario Mercado e Hijos y cedido por ésta a Belén González Salicrup Vda. de Tous Soto e hijos.

El 8 de marzo de 1937 Belén González Salicrup y sus hijos otorgaron escritura cancelando la hipoteca constituída el 23 de marzo de 1932 a favor de Mario Mercado e Hijos. En 9 de marzo de 1937 Elvira otorgó escritura de "Cancelación Parcial de Hipoteca, Venta de Fincas Rústicas y Modificación de Términos de Hipoteca". A virtud de ella canceló parcialmente la hipoteca antes constituída a favor de los aquí demandantes y procedió a vender a éstos las fincas descritas en la escritura. En esa escritura se hizo constar además la existencia del contrato de arrendamiento en favor de Mario Mercado e Hijos y se dijo que los compradores tomarían posesión de las fincas de acuerdo con el referido contrato de arrendamiento. (Fué después de efectuada esta venta que los herederos de Tous Soto y Mario Mercado e Hijos suscribieron la escritura de "Ratificación" a que antes se ha hecho mención.) El 6 de abril de 1937 Mario Mercado e Hijos requirió de los demandantes, mediante acta notarial, el otorgamiento de escritura de traspaso de las fincas vendídasles. A ello se negaron los demandantes, procediendo entonces la aquí demandada a consignar en el antiguo tribunal de distrito de Ponce en 8 de abril de 1937 la suma ofrecida. En igual fecha la aquí demandada presentó ante el mismo tribunal demanda sobre "Resolución de compraventa y otros extremos." (Este pleito finalizó con sentencia favorable a los allí demandados.) Véanse *Mario Mercado e Hijos* v. *Olivieri*, 60 D.P.R. 877 y *Mercado* v. *Commins*, 322 U. S. 465. Mientras estaba pendiente el último pleito mencionado, los aquí demandantes instaron acción de desahucio contra Mario Mercado e Hijos en 6 de diciembre de 1937 ante el mismo tribunal. La demanda de desahucio fué declarada sin lugar por dicho tribunal y la sentencia así dictada fué confirmada por nosotros. *Lluberas* v. *Mario Mercado e Hijos*, 55 D.P.R. 41.

En 20 de octubre de 1944 los Lluberas Pasarell iniciaron la demanda del pleito que ahora está ante nuestra consideración.

poseyeron los demandados, fueron los producidos, o debidos producir en 38 cuerdas de dichos terrenos, máximo cultivable de ellos (declaración de Richardson) con rendimiento total durante el período comprendido en dichas zafras de los años 1937–38, 1938–39, 1939–40, 1940–41, 1941–42, 1942–43, 1943–44, 1944–45 con un total a base de promedio, de 10,575.86 toneladas de caña y beneficio de $42,159.31. . . . . .

"10ª Para la zafra de 1945–46 los demandados invirtieron hasta noviembre de 1945, en gastos, la cantidad de $813.75.

"11ª Como los gastos para la zafra de 1945–46 hechos por los demandados deben abonarse a los aquí requeridos de frutos, el beneficio neto de las ocho zafras en disputa queda reducido a $41,345.56."

Ambas partes apelaron de la sentencia así dictada. Los demandantes insisten ahora en que el tribunal a quo erró (1) al fijar en la suma de $41,345.56 el valor de los frutos producidos y el de los que pudieron producir las fincas de los demandantes desde el 2 de junio de 1937 al 3 de noviembre de 1945, o sea "durante ocho años, cinco meses, un día, cuando el valor líquido de esos frutos producidos y debido producir, y percibir sus dueños nunca debió ser menos de $60,000"; y (2) al fijar los honorarios de los abogados de la parte demandante en la suma de $4,000, cuando dichos honorarios nunca han debido ser menos de $10,000. Y la demandada en que el tribunal sentenciador erró (I) al concluir que los demandantes vinieron en posesión de la finca Cupey sólo por ejecución que hizo el márshal de la sentencia sobre la primera causa de acción; (II) que la posesión y disfrute de dicha finca por la demandada fué de mala fe y a sabiendas de que no tenía título alguno; (III–A) al permitir, después que los demandantes habían presentado toda su prueba, una enmienda para conformar las alegaciones a ésta (Regla 15(b)), incluyendo en la demanda reclamación por *frutos podidos producir*, a pesar de que la enmienda representaba un cambio fundamental en la teoría del caso y a pesar de que los demandantes no presentaron prueba eficaz sobre frutos podidos producir;

(B) al hacer uso del libro "La Industria del Azúcar de Caña en Puerto Rico" publicado en septiembre de 1942 por la División de Investigaciones y Estadísticas de la Junta de Salario Mínimo de Puerto Rico, así como de estadísticas adicionales publicadas por esa Junta correspondientes al año 1943 y siguientes; y la Tabla 2 que aparece en la página 18 de dicha obra, libro, estadísticas y tabla que no fueron ofrecidos en evidencia; (C) al aplicar la Tabla que aparece en la opinión (pág. 122 del legajo de sentencia); (D) al no resolver que los demandantes no probaron frutos; (E) de haberse probado éstos, al fijarlos en $41,345.56; (F) al conceder a los demandantes una suma en exceso de $17,936.80 que fué, según la prueba de la demandada, lo que la finca produjo para ella; y (IV) al condenarles al pago de honorarios y al fijar éstos en la cantidad excesiva de $4,000.

▮ Discutiremos en primer lugar el segundo de los errores señalados por la demandada, toda vez que es de primordial importancia determinar si su posesión fué de buena o de mala fe. De ser de buena fe, a tenor de lo dispuesto por el artículo 380 del Código Civil, ed. 1930, la demandada podría hacer suyos los frutos producidos mientras no fuera interrumpida su posesión.[3] De ser de mala fe, de acuerdo con el artículo 384 del mismo Código,[4] ella vendría obligada no solamente a abonar los frutos percibidos sino también "los que el poseedor legítimo hubiere podido percibir."

El artículo 363 del Código Civil, ed. 1930, preceptúa que "Se reputa poseedor de buena fe al que ignora que en su título o modo de adquirir exista vicio que lo invalide" y que

---

[3] El artículo 380 del Código Civil, ed. 1930 dispone que:
"El poseedor de buena fe hace suyos los frutos percibidos mientras no sea interrumpida la posesión."

[4] El artículo 384 del Código Civil, ed. 1930, reza en lo pertinente así:
"El poseedor de mala fe abonará los frutos percibidos y los que el poseedor legítimo hubiere podido percibir, y sólo tendrá derecho a ser reintegrado de los gastos necesarios hechos para la conservación de la cosa. . . . . ."

"Se reputa poseedor de mala fe al que se halla en el caso contrario." Comentando el artículo 433 del Código Civil Español (equivalente al 363 del nuestro antes copiado), el tratadista Q. Mucius Scaevola, en el tomo 8 de sus Comentarios al Código Civil, ed. de 1948, pág. 226 nos dice que:

". . . . *rigurosamente existe posesión de buena fe cuando el poseedor está en la creencia de que posee en virtud de un justo título, por razón del desconocimiento de los vicios de que éste adolece* . . . . que los requisitos necesarios para la existencia de la posesión de buena fe, son: título, vicios en el título, ignorancia por el poseedor de dichos vicios. Los tres han de coexistir . . . ."

y que (pág. 227):

". . . *el que posee una cosa sin título, sin haberla recibido de otra persona por cualquiera de los modos traslativos del derecho, no puede menos de comprender que posee una cosa que no es suya, y, por lo tanto, que no posee con buena fe.* . . ." (Bastardillas nuestras.)

Al mismo efecto véanse *Capó* v. *A. Hartman & Cía.*, 57 D.P.R. 196, 203 y *Martorell* v. *J. Ochoa & Hno.*, 25 D.P.R. 759, 763.

Conforme se ha hecho constar en el escolio 1 de esta opinión, la demandada entró a disfrutar de la posesión natural de la finca a virtud de un contrato de arrendamiento por un término de 10 años, que expiró el 2 de junio de 1937. Artículo 1455 del Código Civil, ed. 1930.([5]) Desde esa fecha en adelante ¿a virtud de qué título continuó ella en posesión? Obviamente de ninguno, pues aquél a virtud del cual tenía la *posesión natural* ya había expirado. Por tanto, no teniendo título alguno, la demandada no puede ampararse en el artículo 363 del Código Civil, supra, para alegar que continuó en posesión de buena fe.

▮ Por otro lado, podría argüirse que el derecho de opción a que asimismo se hace referencia en el escolio 1 de

---

([5]) El artículo 1455 del Código Civil, ed. 1930 dispone que:
"Si el arrendamiento se ha hecho por tiempo determinado, concluye el día prefijado sin necesidad de requerimiento."

esta opinión constituía un título suficiente para que la demandada permaneciera de buena fe en la posesión. Empero, ya este Tribunal resolvió que tal derecho de opción fué cedido al hacerse la cesión de los pagarés hipotecarios a la Sucesión Tous Soto. Véase *Mario Mercado e Hijos* v. *Olivieri*, 60 D.P.R. 887, confirmado en *Mercado* v. *Commins*, 322 U. S. 465. En su consecuencia, bajo tal contención su posesión tampoco resulta ser de buena fe.

■ Además, la sociedad demandada entró en la posesión natural (no en la posesión civil) (⁶) de las fincas en calidad de arrendataria de las mismas, y como tal poseía a nombre de los dueños de éstas. A este respecto el artículo 361 del Código Civil, ed. 1930, dispone que "la posesión se ejerce en las cosas o en los derechos por la misma persona que los tiene y los disfruta, o por otra en su nombre", y el artículo 365 del mismo cuerpo legal que "Se presume que la posesión se sigue disfrutando en el mismo concepto en que se adquirió, mientras no se pruebe lo contrario." Así, pues, la demandada sabía que tenía la posesión natural de las fincas y que éstas no eran suyas. Teniendo tal conocimiento no es posible concluir que era poseedora de buena fe. *Cf. Capó* v. *A. Hartman &. Cía.*, 57 D.P.R. 196, 203.

■ En realidad, la única prueba presentada por la demandada para desvirtuar la presunción del artículo 365, supra, lo fué la sentencia que declaró no haber lugar al desahucio, dictada unos 10 meses después de finalizar el contrato de arrendamiento. ¿Puede ella escudarse en esa sentencia para alegar que su posesión fué de buena fe? Creemos que no. Si bien de ordinario el que posee en virtud de una sentencia judicial puede ser considerado poseedor de buena fe—sentencia del Tribunal Supremo de España de 4 de marzo de 1893, 73 Jur. Civ. 326—tal sentencia

---

(⁶) El artículo 360 del Código Civil, ed. 1930 nos dice que "Posesión natural es la tenencia de una cosa o el disfrute de un derecho por una persona" y que "Posesión civil es esa misma tenencia o disfrute, unidos a la intención de haber la cosa o derecho como suyos."

habrá de reconocer su derecho a la posesión para que produzca semejantes efectos. La dictada en el caso de desahucio no reconoció tal derecho a la demandada. La misma se fundó en el hecho de que ésta planteó una serie de cuestiones complicadas que tendían a impugnar seriamente la eficacia del título de los demandantes y en que el procedimiento sumario de desahucio no era el apropiado para dirimir tales cuestiones. Esa sentencia no resolvió, sin embargo, que la demandada tenía derecho a la posesión ni mucho menos que la posesión que había venido disfrutando se convertía, a virtud de la sentencia dictada, en una posesión de buena fe. Si dicha sentencia hubiese resuelto en alguna forma que la demandada tenía un título, aunque viciado, quizás la demandada podría ampararse en tal sentencia para sostener que su posesión fué de buena fe, alegando desconocimiento de la existencia de tales vicios. Pero la sentencia dictada no reconoció en momento alguno la existencia de un título en favor de la demandada. Meramente resolvió, repetimos, que la eficacia del título de los demandantes había sido impugnada seriamente y que el desahucio no era el procedimiento adecuado para resolver las cuestiones suscitadas.

Por otra parte, si la demandada creía tener derecho al retracto de las fincas de que estaba en posesión ella debió entregarlas a sus dueños y radicar entonces la demanda correspondiente. Terminada su condición de arrendataria, el carácter de su posesión no podía cambiar por un simple cambio subjetivo. Tal posesión continuó siendo una posesión natural, al igual que lo había sido durante todo el tiempo que duró el contrato de arrendamiento. Mientras poseyó como arrendataria, naturalmente, la demandada tenía derecho a hacer suyos los frutos producidos—10 Manresa, Código Civil, ed. 1950, pág. 672. Terminado el contrato de arrendamiento los frutos no podían pertenecerle.

Siendo la posesión de la demandada, a partir del vencimiento del contrato de arrendamiento, una posesión de mala fe ella está obligada a abonar los frutos percibidos y

los que el poseedor legítimamente hubiese podido percibir. Artículo 384, supra; *Costas* v. *G. Llinás & Cía.*, 66 D.P.R. 730, 750, escolio 15.

■■ La segunda cuestión fundamental a ser resuelta es, en nuestra opinión, la de si el tribunal a quo actuó o no correctamente al dictar sentencia sobre la segunda causa de acción basándose en el libro "La Industria del Azúcar de Caña en Puerto Rico" publicado por la Junta de Salario Mínimo, en las estadísticas preparadas por la misma agencia y en la "Tabla" a que se hace referencia en la opinión emitida por el tribunal a quo. El libro, las estadísticas y la Tabla en cuestión no fueron presentados en evidencia. Por ende, de la única manera que podría sostenerse la actuación del tribunal sentenciador al basar su sentencia en los mismos sería que de ellos dicho tribunal hubiera podido tomar conocimiento judicial correctamente. El artículo 398 del Código de Enjuiciamiento Civil—artículo 36 de la Ley de Evidencia—especifica los hechos que nuestros tribunales tomarán en consideración judicial.([7]) Sin necesidad de que se les ofrezca prueba al efecto, los tribunales tomarán cono-

---

([7]) El artículo 398 del Código de Enjuiciamiento Civil—artículo 36 de la Ley de Evidencia—reza así:

"Los tribunales tomarán en consideración judicialmente los siguientes hechos:

"1. La verdadera significación de todas las voces y frases inglesas y españolas y de todos los términos jurídicos.

"2. Todo lo que estuviere establecido por ley.

"3. Los actos oficiales de los departamentos legislativo, ejecutivo, y judicial de Puerto Rico y de los Estados Unidos.

"4. Los sellos de todas las Cortes de Puerto Rico, de los Estados de la Unión y de los Estados Unidos.

"5. La instauración, firmas y sellos oficiales de los principales funcionarios del gobierno en los departamentos legislativo, ejecutivo y judicial de Puerto Rico y de los Estados Unidos.

"6. La existencia, título, bandera nacional y sello de todo Estado o Soberano reconocido por el poder ejecutivo de los Estados Unidos.

"7. Los sellos de las cortes de almirantazgo y jurisdicción marítima y de los notarios públicos.

"8. Las leyes de la naturaleza, medida de tiempo, divisiones geográficas o historia política del mundo.

"En todos estos casos el tribunal podrá consultar y citar los libros o documentos adecuados."

cimiento judicial de hechos que son de conocimiento general, notorios e indisputables. *De Castro* v. *Junta Comisionados*, 59 D.P.R. 676; *Silva* v. *Carbonell*, 35 D.P.R. 244, 253. La doctrina de conocimiento judicial fué adoptada como un atajo para eludir la necesidad de que se introduzca evidencia de manera formal en ciertos casos en que no existe verdadera necesidad de ofrecer tal evidencia. *Communist Party of United States* v. *Peek*, 127 P. 2d 889; *Elford* v. *Hiltabrand*, 146 P. 2d 510; 20 Am. Jur., página 112, sección 97. El eminente tratadista Wigmore en su obra sobre Evidencia, Vol. IX, tercera edición, página 535, sección 2567, nos dice que el tomarse conocimiento judicial de un hecho meramente significa que el mismo es aceptado como cierto sin que se aduzca evidencia sobre el mismo por la persona que de ordinario hubiera debido ofrecerla; que esto es así porque la corte asume que la cuestión es tan notoria que la misma no será disputada; pero que la parte contraria no estará impedida de disputar la cuestión mediante el ofrecimiento de prueba, de creer ella que tal cuestión es disputable. Véanse también *Ohio Bell Tel. Co.* v. *Comm'n.*, 301 U. S. 292, 81 L. ed. 1093; *Mills* v. *Denver Tramway Corporation*, 155 F. 2d 808; 57 Harv. L. Rev. 269; 59 Harv. L. Rev. 481; 62 Harv. L. Rev. 537; XIV Va. L. Rev. 544.

Si la cuestión que el tribunal a quo hubiera tenido ante su consideración hubiese sido una relacionada en términos generales con la industria del azúcar en esta isla, dicho tribunal hubiera actuado acertadamente al tomar conocimiento judicial de los documentos mencionados, siempre que así lo informara a las partes y diera a éstas la oportunidad de refutarlos. Sin embargo, no era una cuestión general relacionada con la industria azucarera en Puerto Rico la que estaba ante la consideración del tribunal sentenciador, sino una relacionada con la cantidad de caña de azúcar y demás productos cosechados en las fincas en cuestión durante los años en controversia. Para tales fines específicos el tribunal no podía tomar conocimiento judicial de los documentos

a que tantas veces hemos hecho mención, sin dar a las partes la oportunidad de impugnarlos o de explicar su contenido, ni resolver el caso que ante sí tenía fundado exclusivamente en los mismos. *Cf. Mayagüez Sugar Co. v. Tribl. de Apelación*, 60 D.P.R. 753, 767; *Escudero v. Junta Salario Mínimo*, 66 D.P.R. 594 y casos citados a la página 599. Fué, por tanto, un error del tribunal sentenciador el basar su sentencia únicamente en el libro, en las estadísticas y en la tabla indicados sin dar a las partes la oportunidad a que tantas veces hemos hecho mención. Tal error produce naturalmente, la revocación de la sentencia. En el caso que tenía ante sí, el deber del tribunal a quo era basar su sentencia en la prueba sometida por una y otra parte, dirimiendo el conflicto en la misma, dando crédito a la que a su juicio lo merecía y llegando a las conclusiones que en su opinión procedieran.

 No obstante proceder la revocación de la sentencia por el motivo ya apuntado, creemos pertinente discutir siquiera a grandes rasgos los demás errores señalados. No fué un error de parte del tribunal sentenciador concluir que los demandantes adquirieron posesión de la finca en litigio sólo por virtud de la ejecución que hizo el márshal de la sentencia dictada en relación con la primera causa de acción. Sin embargo, si ese error se hubiera cometido el mismo no sería uno que daría lugar a la revocación, ya que la apelación no se da contra los fundamentos de la opinión sino contra la sentencia misma. *Varela v. Fuentes*, 70 D.P.R. 879, 883.

 De conformidad con la Regla 15(*b*) de las de Enjuiciamiento Civil, el tribunal a quo estaba autorizado para permitir que se enmendara la demanda para ajustarla a la prueba ofrecida por los demandantes.(⁸) *Ramos v.*

---

(⁸) La Regla 15(*b*), en lo esencial dispone que "... La enmienda de las alegaciones que fuere necesaria para conformarlas a la evidencia . . . puede hacerse a moción de cualquiera de las partes en cualquier tiempo, . . . ." .

*Viejo*, 66 D.P.R. 642, 648; *Rovira* v. *Oliver*, 70 D.P.R. 113, 115; *Mena* v. *Llerandi*, 70 D.P.R. 176, 180.

Los párrafos (D), (E) y (F) del tercer error señalado por la demandada han quedado resueltos implícitamente al discutirse la cuestión del libro, las estadísticas y la tabla de que el tribunal sentenciador tomó conocimiento judicial.

Sobre los honorarios de abogado meramente diremos que como el caso será devuelto al tribunal de origen para que éste dicte nueva sentencia, existe la posibilidad de que al así hacerlo dicho tribunal concluya que la demandada no fué temeraria y que por ende, no los conceda; o de que, al concluir que la demandada fué temeraria, conceda una suma menor o una suma mayor que la fijada en la sentencia que ahora se revoca. Por tanto, preferimos no pasar de momento sobre esa cuestión.

*Debe revocarse la sentencia apelada y devolverse el caso al tribunal sentenciador para ulteriores procedimientos no inconsistentes con la presente opinión.*

Los Jueces Asociados Sres. Negrón Fernández, Ortiz y Belaval no intervinieron.