MARCIA TORRES MALDONADO, demandante y apelada, *v.* ANTONIO FERNÁNDEZ MÉNDEZ y LUIS G. HERNÁNDEZ, demandados y apelante el último.

Núm. 9146.—*Sometido:* Diciembre 13, 1945. *Resuelto:* Febrero 6, 1946.

*Manuel García Cabrera* y *Antonio Quirós Méndez,* abogados del apelante; *Miranda & Miranda Esteve,* abogados de la apelada.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

Marcia Torres Maldonado compró una finca rústica a Higinio Pastoriza y su esposa por escritura núm. 68 de 15 de mayo de 1929 ante el notario Damián Monserrat Simó. En la escritura se consignó que el precio era de $6,500, de los cuales la compradora pagó $500 y se reservó los $6,000 restantes para atender al pago de la hipoteca a que se hallaba afecta la finca a favor de Antonio Fernández Méndez. Dicha hipoteca la constituyó Pastoriza en garantía de un préstamo que recibió de Fernández Méndez por la cantidad de $6,000, con intereses a razón de 1 por ciento mensual hasta que fuese totalmente satisfecho y se formalizó por escritura núm. 24 de 26 de julio de 1928 ante el notario Eduardo López Tizol. Se estipularon, entre otras, las siguientes condiciones:

"Segundo: Que el capital prestado devengará intereses hasta que sea totalmente satisfecho a razón del uno por ciento mensual pagaderos por meses vencidos en el domicilio del acreedor con la condición de que vencidos tres meses corridos sin ser satisfechos, se entenderá vencida toda esta obligación y estará el acreedor en aptitud para proceder judicialmente al cobro del capital e intereses.

"Plazo

"Tercero: Que el capital prestado será devuelto al acreedor en el término de dos años contados desde esta fecha. [26 de julio de 1930].

"Crédito adicional.

"Cuarto: De común acuerdo se asigna un crédito adicional de quinientos dollars para intereses, costas, gastos, desembolsos y honorarios de abogado en caso de reclamación judicial así: trescientos dollars para intereses y doscientos dollars, para costas, gastos, desembolsos y honorarios de abogado.

"Garantía.

"Quinto: En garantía de los seis mil dollars y de los quinientos dollars de crédito adicional, los cónyuges deudores, Pastoriza-Cruz, constituyen hipoteca voluntaria a favor de don Antonio Fernández Méndez sobre la siguiente finca:"

El citado Fernández Méndez instó en la Corte de Distrito de San Juan el 12 de julio de 1933 un procedimiento sumario ejecutivo contra Marcia Torres Maldonado en cobro de su hipoteca. Alegó en el escrito inicial que la hipoteca había vencido el 26 de julio de 1930 y que desde esa fecha Marcia Torres Maldonado había dejado de pagar intereses, los que calculados por el acreedor ejecutante a razón de 6 por ciento anual montaban a la cantidad de $1,050.[1] Como resultado de ese procedimiento, el 14 de noviembre de 1933 fué adjudicada la finca a Fernández Méndez en satisfacción de la suma reclamada, o sea $6,000 de capital más $1,050 de interés y $200 para costas y honorarios de abogado. Fernández Méndez poseyó la finca hasta el 26 de febrero de 1943, en cuya fecha la vendió a la corporación Personal Savings and Trust Company y ésta la vendió a Luis G. Hernández el 30 de marzo de 1943.

El 4 de mayo de 1944 Marcia Torres Maldonado instituyó este pleito contra Antonio Fernández Méndez y Luis G. Hernández solicitando la nulidad del procedimiento ejecutivo por los siguientes fundamentos:

a) Porque en el escrito inicial no fueron señaladas específicamente las cantidades reclamadas por concepto de intereses y las que se cobraban a cuenta del capital del crédito,

---

[1] Calculados a razón de 6 por ciento los intereses ascienden a $1,066.

ni se expresó la cantidad líquida de la reclamación conforme lo exige el art. 169 del Reglamento para la Ejecución de la Ley Hipotecaria;

*b)* Porque es imposible determinar las cantidades que en el escrito inicial se reclaman por concepto de intereses, "ya que la deudora se obliga por la escritura de constitución del préstamo a pagar intereses al tipo del uno por ciento mensual hasta el total pago de la deuda y en el escrito inicial se cobran intereses legales desde la fecha del vencimiento de la hipoteca hasta el día de la radicación del escrito inicial y se dice que esos intereses montan a la suma de $1,050.'';

*c)* Porque el auto de requerimiento expedido en el procedimiento ejecutivo es nulo, toda vez que en el escrito inicial se reclaman intereses legales desde que venció la obligación hasta que se radicó el escrito inicial, y la corte ordenó que la demandada fuese requerida del pago de intereses desde la constitución de la hipoteca hasta la radicación del escrito inicial;

*d)* Porque la corte no adquirió jurisdicción sobre la persona demandada en dichos procedimientos, por ser nulo el diligenciamiento del auto de requerimiento. Al alegar tal nulidad se basó la demandante en este pleito en que la corte ordenó al márshal que, si la deudora hipotecaria no residiere en Puerto Rico, se intentase el requerimiento con los apoderados o arrendatarios y el márshal se extralimitó haciendo un diligenciamiento distinto del ordenado por la corte, puesto que notificó a los apoderados de la deudora por no haber sido localizada en el distrito judicial de San Juan y por ignorar su residencia, siendo las condiciones necesarias **para prescindir del requerimiento** personal que la deudora no resida en el distrito judicial municipal y este hecho no aparece del requerimiento; y

*e)* Porque el escrito inicial, el auto del requerimiento y su diligenciamiento y la venta de la finca en pública subasta efectuada por el márshal son nulos, ya que la corte no ad-

quirió jurisdicción sobre la deudora hipotecaria, y además porque se requirió y cobró a la deudora una suma montante a $750 de intereses que no estaban garantizados con la hipoteca.

Como consecuencia de la nulidad alegada, reclamó la restitución de la finca, más los frutos producidos o debidos producir, consintiendo a su vez en que se restableciese el crédito hipotecario con todas sus consecuencias.

La corte consideró y desestimó los motivos de nulidad expuestos bajo las letras *a, b, c* y *d,* pero declaró con lugar la demanda basándose en el motivo marcado *e,* es decir, en que el acreedor había cobrado $750 en exceso de los $300 del crédito adicional para intereses, única cantidad que, dentro del procedimiento ejecutivo, según la corte y la apelada, el acreedor hipotecario tenía derecho a cobrar en adición al capital.

Como consecuencia de la declaración de nulidad del procedimiento ejecutivo hipotecario, la corte inferior condenó a los demandados a restituir a la demandante la finca hipotecada, con los frutos producidos o debidos producir. A la vez condenó a la demandante a pagar a los demandados ciertas cantidades por concepto de gastos de administración, mejoras, contribuciones, etc.

Contra esa sentencia estableció recurso de apelación el demandado Luis G. Hernández.

◼ Convenimos con el juez de la corte inferior en que dentro del procedimiento ejecutivo cualquier cantidad que se cobre sin haber sido hipotecariamente asegurada, vicia de nulidad el procedimiento. *Santos* v. *Crédito y Ahorro Ponceño,* 41 D.P.R. 946; *Martorell* v. *Crédito y Ahorro Ponceño,* 42 D.P.R. 655; *Vázquez vda. de McCormick* v. *Gutiérrez,* 52 D.P.R. 170 y *Figueroa* v. *Boneta,* 58 D.P.R. 811. Sentado este principio, la cuestión primordial en este recurso consiste en determinar si la cantidad de $750 que alega Marcia To-

rres se le cobró en exceso por concepto de intereses, estaba o no hipotecariamente garantizada.

■ Consecuencia lógica del principio jurídico de que lo accesorio sigue al principal, es la de que los intereses, como frutos que son del capital, si éstos son estipulados en la escritura con expresión del tipo convenido y así se hace constar en la inscripción, quedan asegurados con la hipoteca que garantiza el capital, aunque no se hayan garantizado expresamente. La Comisión de Códigos, refiriéndose a esta materia, bajo el epígrafe "Extensión de la Hipoteca", dijo en su Exposición Sobre los Motivos y Fundamentos de la Ley Hipotecaria de 8 de febrero de 1861:

"¿Y debe ser extensiva la hipoteca a garantir los intereses del capital asegurado por ella? Nada dice de esto nuestro derecho antiguo ni era de presumir que lo dijera, cuando tan severamente reprobaba la usura, entendiendo que lo era todo aquello que el deudor tenía que dar al acreedor en cuanto excediera de la misma suma prestada, y considerando sólo lícito el interés cuando lo admitían en el fuero de la conciencia los moralistas más rígidos. Pero desde que el derecho escrito empezó a mitigar el rigor antiguo; desde que prevaleciendo otros principios económico-políticos, quedó para siempre destruído el error de que el dinero no era productivo; desde que el legislador se convenció de que las graves penas para extinguir el interés del dinero se convertían contra las personas para cuya protección se habían dictado, pues que tenían que pagar un interés más alto por los capitales que recibían (medio de compensar en cierto modo los peligros que corría el prestamista), *no podían dejar de considerarse afectas las fincas hipotecadas al pago de los intereses, como lo estaban al del capital.*" (Bastardillas nuestras.)

Y más adelante, bajo el epígrafe "De las Hipotecas Voluntarias", repite:

"Al tratar de la extensión de la hipoteca, queda dicho *que comprende también los intereses del capital prestado* con las restricciones que se han creído conveniente para evitar perjuicios a tercero." (Bastardillas nuestras.)

Consistentes con el principio enunciado en los párrafos transcritos de la Exposición de Motivos, sus autores consignaron en el art. 12 de la Ley Hipotecaria:

"Las inscripciones hipotecarias de créditos expresarán en todo caso el importe de la obligación garantizada y el de los intereses, *si se hubieren estipulado,* sin cuya circunstancia no se considerarán asegurados por la hipoteca dichos intereses en los términos prescritos en la presente ley." (Bastardillas nuestras.)

Al mismo efecto, véanse Galindo y Escosura, Comentarios a la Legislación Hipotecaria, T.3, págs. 218–219; Morell, Comentarios a la Legislación Hipotecaria, T.3, pág. 715; Barrachina, Comentarios a la Ley Hipotecaria, T.3, págs. 86–88; Gómez de la Serna, La Ley Hipotecaria, T.1, pág. 484, párrafo 31; Sánchez Román, Derecho Civil Español, Común y Foral, T.3, págs. 803–804; Martínez Moreda, Legislación Hipotecaria, T.1, págs. 527, 532; Moscoso, Tratado de Legislación Hipotecaria, pág. 214; F. Clemente de Diego, Instituciones de Derecho Civil Español, T.1, pág. 467; Demófilo de Buen, Derecho Civil Español Común, T.1, pág. 317; Valverde, Tratado de Derecho Civil Español, T.2, págs. 648, 650 y Manuel Dorta Duque, Curso de Ley Hipotecaria, T.1, págs. 128, 129.

Pero como el fin de la Ley Hipotecaria es promover el crédito territorial a base de la seguridad de la hipoteca y del pago de lo ofrecido, sus autores no pudieron pasar por alto los derechos del tercero que adquiriese el dominio de la finca gravada o un derecho real sobre la misma. A ese fin dispusieron en el art. 114 de la Ley Hipotecaria:

"La hipoteca constituída a favor de un crédito que devengue interés, no asegurará, con perjuicio de tercero, además del capital, sino los intereses de los dos últimos años transcurridos y la parte vencida de la anualidad corriente."

Consecuentes con el principio expuesto en el art. 1774 del Código Civil y el 146 de la Ley Hipotecaria al efecto de que para la válida y eficaz constitución de la hipoteca es nece-

sario que el documento en que se constituya sea inscrito en
el Registro de la Propiedad, prescribieron en el art. 145 de
la Ley Hipotecaria lo siguiente:

"No se considerará asegurado con la hipoteca el interés del prés-
tamo en la forma que prescribe el art. 114, sino cuando la estipu-
lación y cuantía de dicho interés resulten de la inscripción misma."

En el presente caso, en la escritura de hipoteca, se esti-
puló que el capital del préstamo devengaba intereses "hasta
que sea totalmente satisfecho a razón del 1 por ciento men-
sual"; y de la certificación del Registrador de la Propiedad
que se acompañó al escrito inicial en el procedimiento eje-
cutivo, aparece que al inscribirse la hipoteca la estipulación
sobre intereses y el tipo de los mismos se hicieron constar
en la inscripción, en cumplimiento de lo dispuesto en el art.
12 de la Ley Hipotecaria. Siendo ello así, los intereses que-
daron garantizados con la hipoteca que aseguró el capital.

■ Pero como de conformidad con el art. 114 de la Ley
Hipotecaria, constituído un crédito que devengue intereses,
no asegura, con perjuicio de tercero, en adición al capital,
sino los intereses de los dos últimos años transcurridos, y la
parte vencida de la anualidad corriente, debemos determinar
ahora si, de acuerdo con la evidencia de este caso, Marcia
Torres era o no responsable de los $1,050 de intereses que
se devengaron después de haber adquirido ella el inmueble.

Morell opina que el tercer poseedor no asume la obliga-
ción personal del primitivo deudor, a menos que se haya
subrogado en tal obligación, y por consiguiente no es respon-
sable de los intereses que se devenguen a partir de la fecha
en que adquirió el inmueble, los cuales siguen siendo de
cuenta del deudor hipotecante. Ob. Cit., T.3, pág. 717. Este
Tribunal ha seguido la misma doctrina en los casos de *Hi-
lario Santos* v. *Morán*, 32 D.P.R. 59; *Trueba* v. *Rosales &
Cía*,. 33 D.P.R. 1027 y *López Cepero* v. *Sierra*, 49 D.P.R. 345.
Otros comentaristas, tales como Galindo y Escosura en sus
Comentarios a la Legislación Hipotecaria de España, T.3,

(4ta. ed.) pág. 245 y Martínez Moreda, Legislación Hipotecaria, T.1, pág. 536, opinan, por el contrario, que el tercer poseedor responde en adición a las dos últimas anualidades y la parte vencida de la corriente, de todos los intereses que se devenguen a partir de la adquisición porque desde esa fecha el tercer poseedor sustituye al deudor hipotecante.

Ya sigamos la teoría de Morell y los casos citados, ya la de Galindo y Escosura y Martínez Moreda, el resultado será siempre el mismo, pues Marciá Torres, habiendo retenido del precio la parte necesaria para pagar la hipoteca al acreedor, se subrogó en la obligación del deudor hipotecante, y consecuentemente era responsable de los intereses que se devengaron desde que dejó de satisfacerlos el 26 de julio de 1930 hasta que se instó el procedimiento ejecutivo.

▪ Empero, el juez de la corte inferior y la apelada sostienen que a virtud de la cláusula quinta de la escritura por la cual se constituyó la hipoteca "en garantía de los $6,000 y de los $500 de crédito adicional", de ellos $300 para intereses y $200 para costas, la hipoteca en todo caso sólo garantiza por concepto de intereses la cantidad de $300, tanto en cuanto al deudor primitivo como en lo que respecta al posterior adquirente.

Esa interpretación pierde de vista que la hipoteca que expresamente se constituyó para garantizar el capital, implícitamente aseguró por ministerio de la ley, los intereses que debe pagar el primitivo deudor hasta que la deuda sea totalmente satisfecha. Consecuentemente era innecesario constituir otra hipoteca para garantizar lo que la ley ya había garantizado. Si consideramos que como regla general el interés es el único incentivo que mueve al acreedor a prestar su dinero; y si tenemos en cuenta la protección que la ley da al acreedor hipotecario garantizándole con la hipoteca todos los intereses estipulados—siempre que se hagan constar en la inscripción—mientras la finca gravada pertenezca al primitivo deudor, no debemos presumir que el acree-

dor ha renunciado en parte a ese derecho, reduciendo la garantía a cinco mensualidades de intereses ($300) solamente, a menos que de manera clara e inequívoca surja del contrato la intención de los contratantes de modificar la norma prescrita por la ley. Por el contrario, del contexto de la escritura surge que no fué esa la intención de los contratantes, pues no solamente estipularon intereses por el término del contrato, sino que los convinieron hasta que la obligación fuese totalmente satisfecha y estipularon, además, que vencidas tres mensualidades de intereses y no satisfechas, el acreedor tendría derecho a proceder judicialmente al cobro del capital e intereses.

Es regla fundamental de interpretación que cuando un contrato ha sido regulado por la ley se presume que los contratantes han aceptado íntegramente las normas de la ley que lo regula, a menos que expresamente esa norma haya sido excluída o modificada por la voluntad de los contratantes. Ya hemos visto que el contrato de hipoteca está regulado por la Ley Hipotecaria y que de acuerdo con la misma en un crédito que devengue interés, éste se halla garantizado con la hipoteca mientras la finca gravada se encuentre en poder del primitivo deudor o de un posterior adquirente que se haya subrogado en su obligación, siempre que la estipulación de intereses y el tipo se hagan constar en la inscripción. A este efecto dijo Manresa:

"Las leyes en general y los elementos del contrato como criterio de interpretación.—Antes de entrar en el examen particular de las distintas reglas que da el Código, debemos indicar una fundamental, una norma que no puede olvidarse, porque decide el problema de la interpretación, y en realidad impide que se presente, por deficiencia u omisión, en los más de los casos.

"Aludimos al conjunto de leyes que regulan cada contrato, o todos en general; a esa especie de modelo impreso que la ley, con sus preceptos no necesarios, da hecho a los contratantes para que lo acepten íntegramente, lo modifiquen en lo que no es esencial y obligatorio, o lo completen con cuanto sea lícito y conforme a su naturaleza. Esas normas supletorias, esos modelos legales, deben

suponerse aceptados si nada en contrario se dice, y, por consiguiente, hasta donde haya llegado la previsión del legislador, estará completado el contrato, y la deficiencia del mismo suplida en principio, probablemente sin necesidad de interpretación. Así, con la simple conformidad sobre la cosa y el precio, en el contrato de compraventa, quedarán fijadas por sumisión tácita a la ley las variadas incidencias que en el cumplimiento del mismo se pueden presentar de ordinario.

"Con lo dicho se relaciona la aceptación de los elementos naturales del contrato, mientras no se estipule lo contrario, y la exclusión de los accidentales si no se pactan; distinción que ya indicamos (art. 1261) y que sanciona la jurisprudencia, diciendo que 'las circunstancias naturales de los contratos se entienden comprendidas en el consentimiento, a no estipularse explícitamente lo contrario' (sentencia de 21 de Noviembre de 1862), y que 'toda condición o circunstancia que pertenece a la naturaleza ordinaria de un contrato, se entiende siempre comprendida en él, a no ser que se la haya excluído expresamente por la voluntad de los contrayentes; siendo lo contrario lo que sucede con la circunstancia que es de suyo accidental, porque no puede exigirse su cumplimiento sino cuando se pacta de un modo explícito y concreto'. (Sentencia de 5 de Mayo de 1873)." Comentarios al Código Civil, T. 8, (2da. ed. 1907) pág. 703.

El razonamiento de la corte inferior para concluir que la garantía de los intereses, aún en lo que respecta al primitivo deudor, fué limitada a $300, confunde la hipoteca principal que garantizó el capital e intereses hasta el total pago de la deuda, con la hipoteca especial que redujo la responsabilidad por intereses con perjuicio de tercero, de dos anualidades y la corriente, a la cantidad de $300.

En el caso de *Gutiérrez vda. Crosas* v. *Longpré,* 44 D.P.R. 667, se trataba de un pleito sobre nulidad de un procedimiento ejecutivo. Se alegaba, como en éste, que el acreedor había cobrado más intereses de los que hipotecariamente habían sido asegurados; y en la escritura de préstamo con hipoteca, la deudora se obligó a garantizar los $40,000 objeto del préstamo al 8 por ciento anual. "El aludido contrato contenía una cláusula adicional por virtud de la cual la deu-

dora nominalmente aceptó o acordó especialmente pagar hasta $1,000 como intereses.'' Se convino, además, que vencidos y no pagados los intereess por el término de seis meses, se consideraría vencida la hipoteca. Resolviendo esa cuestión dijo este Tribunal:

"No podemos convenir con la apelada ni con la corte inferior en que los acreedores hipotecarios estaban limitados a la suma de $1,000 por intereses, toda vez que si bien se mencionó específicamente esa suma, la escritura de hipoteca en su totalidad tendía a demostrar que las partes convinieron en pagar una suma mucho mayor por concepto de intereses. La escritura de hipoteca proveía el pago de un principal con intereses al 8 por ciento, así como que la hipoteca vencería si los deudores dejaban de pagar los intereses durante seis meses, y este pleito fué incoado por tal incumplimiento. La intención de la escritura de incluir todos los intereses fué clara y la cláusula adicional relativa a los mil dólares no podía considerarse como una limitación.'' (Pág. 677.) [2]

Lo expuesto nos lleva a la conclusión de que debe considerarse que la hipoteca especial sólo se constituyó, en lo que respecta a los intereses, para limitar la garantía de éstos en perjuicio de tercero.

■ Siendo ello así, erró la corte a quo al anular el procedimiento ejecutivo por el motivo marcado e, que acabamos de discutir. Pero como el recurso de apelación se interpone contra la sentencia y no contra sus fundamentos, si de las alegaciones y de la prueba surgen otros fundamentos por los cuales pueda sostenerse la sentencia, en tal caso la misma debe prevalecer. Examinemos, pues, los motivos a, b, c y d que la corte a quo consideró y desestimó.

■ a) El fundamento marcado a no merece seria consideración. En el escrito inicial se reclamaron $6,000 de capital y $1,050 de intereses que se dice son los adeudados desde el 26 de julio de 1930 hasta el 12 de julio de 1933,

---

[2] Es de notarse el hecho de que al iniciarse el 12 de julio de 1933 el procedimiento ejecutivo motivo de este recurso de apelación, hacía cuatro meses que se había resuelto el caso de *Gutiérrez vda. de Crosas* v. *Longpré,* 44 D.P.R. 667.

fecha en que se radicó el procedimiento ejecutivo, más $200 para honorarios de abogado. Creemos con el juez de la corte inferior, que más específicamente no podían señalarse las cantidades reclamadas.

b) El marcado con la letra b es insostenible. Una mera operación aritmética revela que al fijar en la cantidad de $1,050 los intereses sobre $6,000 desde el 26 de julio de 1930 hasta el 12 de julio de 1933, la computación se hizo a razón de 6 por ciento anual. Es verdad que los intereses fueron convenidos a razón de 12 por ciento anual, pero como al cobrarlos al 6 por ciento no se reclamó más de lo que hipotecariamente se había garantizado para esa atención, el beneficio que en esa forma obtuvo la deudora no puede viciar de nulidad el procedimiento.

c) El hecho de que en el escrito inicial se reclamasen intereses desde que venció la obligación y en la orden de requerimiento se dijera erróneamente que la cantidad de $1,050 correspondía a los intereses vencidos desde que se constituyó la hipoteca hasta que se inició el procedimiento ejecutivo, es un error sin importancia, pues como cuestión de hecho dicha suma corresponde a los intereses devengados a razón de 6 por ciento anual desde el vencimiento de la obligación hasta el día en que se radicó el procedimiento ejecutivo.

d) Y por último, también carece de fundamento el motivo marcado con la letra d. Del diligenciamiento del márshal consta que él hizo el requerimiento en las personas de los apoderados de la demandada, quienes se hallaban en tal concepto al frente de la finca, no encontrándose la demandada en el distrito judicial de San Juan e ignorando el márshal el sitio de su residencia. Además, de la prueba de la propia demandante en este pleito de nulidad, resulta que ésta, desde el año 1928 trasladó su residencia a los Estados Unidos y a la fecha del juicio de nulidad continuaba viviendo en aquel país.

*Siendo erróneo el fundamento que sirvió de base a la sentencia y no resultando de las alegaciones y la prueba ningún otro que la sostenga, procede revocarla y dictar otra declarando sin lugar la demanda con imposición de costas a la demandante.*

Los Jueces Presidente Sr. Travieso y Asociado Sr. Córdova no intervinieron.