Amelia Costas Ferrer, sustituída por Josefa María Francisca, Águeda Aurora Carolina, Álvaro y Amelia Santaella Costas, demandantes, apelados y apelantes, *v.* G. Llinás & Co., S. en C., y Jorge Llinás Morell, demandados, apelantes y apelados.

Núm. 9285.—*Sometido:* Mayo 3, 1946. *Resuelto:* Diciembre 5, 1946.

*Rafael Hernández Matos,* abogado de los demandantes, apelados y apelantes; *Luis López de Victoria* y *Arturo Ortiz Toro,* abogados de los demandados, apelantes y apelados.

EL JUEZ ASOCIADO SEÑOR DE JESÚS emitió la opinión del tribunal.

Se trata de un pleito sobre nulidad de procedimiento ejecutivo y otros extremos. La demandante obtuvo del Banco Crédito y Ahorro Ponceño, sucursal de Yauco, un préstamo de $3,000. La operación se realizó el 1ro. de mayo de 1928 con la garantía de G. Llinás & Co., S. en C., suscribiéndose por la demandante, aquel mismo día, un pagaré por dicha cantidad, vencedero el 1ro. de noviembre de 1928, con intereses al tipo de 10 por ciento anual. La demandante sólo recibió $2,850 porque el Banco descontó por adelantado los intereses hasta noviembre 1ro., 1928. Un día después de recibido el préstamo, la deudora convino con la fiadora en que ésta pagaría al Banco la obligación de $3,000 a su vencimiento y además le suministraría dinero para la refacción de la finca que más adelante se menciona, hasta completar la cantidad de $4,000. El mismo día, es decir, el 2 de mayo de 1928, la deudora otorgó una escritura ante el notario Luis L. Yordán Dávila en la que confesó que con anterioridad a la fecha de su otorgamiento había recibido de G. Llinás & Co., S. en C., en distintas partidas, en calidad de préstamo, la cantidad de $4,000 y para garantizar esa suma y además $500 para intereses y $300 para costas y honorarios de abogado, constituyó hipoteca sobre una finca rústica de su propiedad, radicada en el barrio Collores de Juana Díaz. Se convino en la escritura que la cantidad prestada devengaría intereses a razón de 10 por ciento anual desde la fecha de su otorgamiento hasta su completo pago y que la demora, tanto en el pago del capital como en el de sus intereses, devengaría también intereses al 10 por ciento anual. Asimismo se estipuló que los $4,000 se pagarían en la siguiente forma: En el mes de diciembre de 1928 la cantidad de $2,000 y los intereses correspondientes y en diciembre de los dos años siguientes $1,000 y sus respectivos intereses.([1])

---

([1]) El contrato de hipoteca contiene otras condiciones a que no hacemos referencia por ser innecesario a los efectos de esta opinión.

No habiéndose satisfecho el primer plazo a su vencimiento, G. Llinás & Co., S. en C., instó un procedimiento sumario ejecutivo el 19 de julio de 1929 para cobrar dicho plazo y sus intereses. En el escrito inicial se reclamaron $2,000 de capital, $270 de intereses (sobre $4,000 desde mayo 2 hasta el 31 de diciembre de 1928) más $125.48 por intereses de mora sobre $2,270 desde el 1ro. de enero hasta el 19 de julio de 1929, fecha en que se radicó el procedimiento, o sea un total de $2,395.48 más $300 por concepto de costas y honorarios de abogado. El procedimiento culminó con la venta judicial de la finca a Jorge Llinás Morell, socio de la acreedora, por la suma de $100(²) que entregó al márshal en el acto de la subasta el 11 de septiembre de 1929 y desde esa fecha el comprador se halla en su posesión.

Basándose en varios de los alegados motivos de nulidad, entre ellos, por haberse vendido la finca para pagar a la acreedora cantidades que Amelia Costas Ferrer no le debía y consecuentemente no podían estar hipotecariamente garantizadas, el 16 de marzo de 1945 la corte a quo dictó sentencia declarando nulo el procedimiento ejecutivo, ordenando la restitución de la finca a la demandante y condenando a los demandados solidariamente al pago de los frutos producidos o debidos producir, debiendo la demandante a su vez pagar el importe del crédito hipotecario con sus intereses y las demás cantidades a cuyo resarcimiento tienen derecho los demandados(³) Deducidas esas sumas los demandados fueron condenados a pagar $13,659.88 por concepto de frutos y a devolver a la demandante 75 acciones del Federal Land Bank of Baltimore que había ésta adquirido del referido Banco

(²)Como parte del precio el comprador también se hizo cargo de satisfacer al Federal Land Bank of Baltimore una primera hipoteca a que se hallaba afecta la finca por el importe de $7,500 de un préstamo por 20 años con intereses al 6 por ciento anual y dos créditos adicionales de $1,125 para intereses y $500 para costas, gastos y honorarios de abogado, respectivamente.

(³)De esas cantidades nos ocuparemos más adelante en el curso de esta opinión.

al obtener el préstamo de $7,500 y que luego había transferido a Jorge Llinás.

## I

■ Al considerar el alegado motivo de nulidad consistente en haber cobrado cantidades que no estaban hipotecariamente garantizadas, precisa tener en cuenta, que aunque en la escritura de hipoteca la deudora confesó haber recibido en distintas partidas la cantidad de $4,000, de la propia escritura y de la contestación a la demanda surge que esa suma incluye la cantidad de $3,000 correspondiente al pagaré que G. Llinás & Co., S. en C., se obligó a satisfacer por la deudora a su vencimiento el 1ro. de noviembre de 1928([4]) y que en los $1,000 que alegaron los demandados le habían entregado para refacción están incluídos $620.18 que es el mon-

---

([4]) No obstante esa confesión, en la cláusula 11 de la misma escritura se expuso lo siguiente:

"Décima-primera: Se establece por las partes contratantes para la debida claridad, que la sociedad acreedora 'G. Llinás y Compañía, S. en C.', en virtud de todo lo consignado en la presente escritura, y de la hipoteca en ella constituída, se compromete, a pagar directamente, a su vencimiento, el vale que por la suma de tres mil *dollars* tiene firmado Doña Amelia Costas Ferrer, por medio de su apoderado el compareciente Don Alvaro Santaella, a favor de Don Carlos Pierantoni, para vencer el día primero de noviembre del corriente año mil novecientos veinte y ocho, cuyo vale está garantizado por la referida sociedad G. Llinás y Compañía, S. en C., la cual sociedad releva desde ahora de toda responsabilidad y del pago de dicho vale, a los expresados Doña Amelia Costas Ferrer y Don Carlos Pierantoni, y renuncia a toda reclamación."

También en los párrafos 7 y 8 de la Contestación se dice lo siguiente:

"*Séptimo:* Del hecho séptimo de la demanda aceptan los demandados que G. Llinás y Compañía, S. en C., convino con la demandante en hacerse cargo del pago de la deuda de $3,000 adeudados por la demandante al Crédito y Ahorro Ponceño, Sucursal Yauco, y en completarle en dinero efectivo su deuda en cuenta corriente hasta la suma de $1,000 lo cual elevaría la deuda de la demandante para con G. Llinás y Compañía, S. en C., a la suma de $4,000, estipulándose intereses sobre esa deuda al 10 por ciento anual;". . . .

"*Octavo:* Del hecho octavo de la demanda aceptan los demandados, que en 2 de mayo de 1928 el Doctor Alvaro Santaella Costas, hijo de la aquí demandante y como apoderado de ella y Jaime Castañer Garau como socio gestor de G. Llinás y Compañía, S. en C., otorgaran la escritura número 32 ante el Notario don Luis Yordán Dávila a los efectos de formalizar el convenio relatado en el hecho séptimo precedente y garantizar el pago de dichos $4,000 y sus intereses en la forma preconvenida, con segunda hipoteca sobre la descrita finca; y que

tante de diez cheques (⁵) que la demandante recibió de G. Llinás & Co., S. en C., para ese objeto.

Si bien la demandante admitió en su demanda que en adición a los $3,000 del pagaré había recibido los $1,000 correspondientes a la refacción, en el curso del juicio presentó evidencia sin oposición de la parte contraria tendente a probar que por concepto de refacción sólo había recibido la cantidad de $620.18, montante de los cheques relacionados en la nota 5 y que al otorgarse la escritura de hipoteca no debía a G. Llinás & Co., S. en C., ninguna otra cantidad. En su consecuencia, solicitó y obtuvo permiso para enmendar su demanda para conformarla con la prueba. Sobre este particular el demandado Jorge Llinás, llamado como testigo de la demandante, declaró que al otorgarse la escritura de hipoteca la ahora demandante estaba adeudando a G. Llinás & Co., S. en C., un crédito por $695 procedente de un contrato anterior de refacción más $75 que había entregado al Dr. Santaella como apoderado de la ahora demandante. El Dr.

---

el apoderado Sr. Alvaro Santaella Costas declaró y confesó que su mandante estaba adeudando a G. Llinás y Compañía, S. en C., la cantidad de $4,000; niegan que en realidad no hubiera recibido de G. Llinás y Compañía, S. en C., dicha cantidad pues la había recibido en la forma convenida y explicada en el hecho precedente o sean $3,000, que G. Llinás y Compañía, S. en C., se obligó a pagar por cuenta de la aquí demandante al Crédito y Ahorro Ponceño, Sucursal Yauco, más el balance resultante de la liquidación de la cuenta corriente de la aquí demandante, y la deficiencia hasta cubrir la suma de $1,000 en efectivo a disposición de la demandante, efectivo del que dispuso y tomó la demandante oportunamente.''

(⁵)La siguiente es una relación de los referidos cheques con sus cuantías respectivas y fechas de expedición:

| | |
|---|---:|
| ''En julio 31 de 1928 | $50.00 |
| ''En agosto 9 de 1928 | 50.00 |
| ''En agosto 16 de 1928 | 50.00 |
| ''En agosto 22 de 1928 | 75.00 |
| ''En agosto 30 de 1928 | 75.00 |
| ''En agosto 30 de 1928 | 115.18 |
| ''En Sept. 7 de 1928 | 80.00 |
| ''En Sept. 20 de 1928 | 50.00 |
| ''En Sept. 24 de 1928 | 42.00 |
| ''En Sept. 26 de 1928 | 33.00 |
| Total | $620.18 '' |

Santaella y Carlos Pierantoni, por el contrario, declararon que la ahora demandante nada debía a G. Llinás & Co., S. en C., con anterioridad a la fecha en que se otorgó la escritura de hipoteca. El juez de la corte inferior, apreciando esa evidencia, no dió crédito al testimonio de Jorge Llinás y declaró probado que al iniciarse el procedimiento, lo adeudado por la ahora demandante por concepto de capital, eran $3,620.18 o sea los $3,000 del pagaré más los $620.18 de los diez cheques relacionados en la nota 5.

Arguyen los demandados que la corte inferior erró al declarar probado que al iniciarse el procedimiento ejecutivo, la deudora hipotecaria sólo debía a la acreedora la cantidad de $3,620.18 y al no declarar que los $4,000 fueron completados con los $695, y los $75 del cheque mencionados anteriormente. Aceptan, sin embargo, que los $620.18 están incluídos en la cantidad de $1,000 que alegaron haber entregado para refacción. Si a los $695 procedentes del supuesto contrato anterior de refacción sumamos los $620.18 y los $75 antes mencionados, inmediatamente veremos que lo entregado para refacción según los demandados, debió ascender a $1,390.18 y si a esta cantidad agregamos los $3,000 del pagaré, el resultado será que al finalizar el mes de septiembre de 1928(6) la ahora demandante debió estar adeudando a la acreedora hipotecaria la cantidad de $4,390.18, es decir $390.18 en exceso de la garantía hipotecaria.

Examinadas las condiciones de la escritura de hipoteca y la conducta observada por G. Llinás & Co., S. en C., en sus transacciones con la deudora demostrativas todas de un celo extraordinario en la protección de sus intereses, se hace difícil creer que la acreedora le diera la cantidad de $390.18 en exceso de la garantía hipotecaria. Bastará decir que no satisfecha con la garantía que le brindaba la finca hipotecada, la acreedora hizo poner una condición en la escritura de hipoteca, a virtud de la cual, la deudora quedaba obligada

---

(6)El último cheque para refacción lleva fecha 26 de septiembre de 1928.

a entregarle la cosecha del café que produjese la finca aumentando de ese modo la garantía con el precio del producto y terminantemente se prohibió a la deudora vender la cosecha a otras personas que quizás podrían darle mejòr precio; se estipuló también en la escritura que si la deudora vendía la finca la deuda quedaba *ipso facto* vencida y la acreedora en aptitud de proceder a la ejecución; que cualquier dilación en el pago de un plazo y los intereses, no debía entenderse como una prórroga; y por último, que el mismo día de la subasta Jorge Llinás, socio de la acreedora, se trasladó a la finca para embargar dentro del mismo procedimiento una pequeña partida de ganado que allí tenía la ahora demandante. El propósito de ese embargo era aplicar el producto del ganado a la deficiencia que resultó en el cobro de la hipoteca al pagar Llinás por la finca la cantidad antes mencionada. Todas estas circunstancias y el hecho de que la sociedad demandada, quien trajo sus libros a la corte en cumplimiento de una citación *duces tecum* no los presentara en evidencia para probar la deuda de $695, indudablemente debieron influir mucho en la apreciación de la evidencia por parte del juez de la corte inferior. No estamos convencidos de que la apreciación que hizo la corte de la prueba sobre este particular sea errónea.

■ Toda vez que al iniciarse el procedimiento ejecutivo la ahora demandante, conforme declaró probado la corte, sólo debía a los demandados, por concepto de capital, la cantidad de $3,620.18 y en el procedimiento ejecutivo se cobraron intereses sobre un capital de $4,000,(⁷) es claro que dicho procedimiento se instó en cobro de una cantidad mayor que la que realmente debía la ahora demandante y garantizaba

---

(⁷)Los demandados presentaron unas cartas de G. Llinás & Co., S. en C., y las contestaciones de Carlos Pierantoni tendentes a probar que la ahora demandante aceptó que debía a G. Llinás & Co., S. en C., la cantidad de $4,000; pero como los demandados no lograron probar que Pierantoni era apoderado de Amelia Costas Ferrer, estas cartas fueron admitidas solamente para contradecir a Pierantoni en cuanto declaró que al establecerse el procedimiento ejecutivo G. Llinás & Co., S. en C., no había hecho previamente gestiones de cobro cerca de su deudora.

la hipoteca. Por consiguiente el procedimiento ejecutivo quedó, por ese motivo, viciado de nulidad. *Torres* v. *Fernández,* 65 D.P.R. 622, 627; *Figueroa* v. *Boneta,* 58 D.P.R. 811; *Vázquez vda. McCormick* v. *Gutiérrez,* 52 D.P.R. 170; *Martorell* v. *Crédito y Ahorro Ponceño,* 42 D.P.R. 655 y *Santos* v. *Crédito y Ahorro Ponceño,* 41 D.P.R. 946.

Además, ya hemos visto que la finca hipotecada fué vendida para el pago de $2,000 del primer plazo, $270 de intereses (sobre $4,000 desde el 2 de mayo hasta el 31 de diciembre de 1928) más $125.48 por intereses de mora al 10 por ciento sobre $2,270 desde el 1ro. de enero hasta el 19 de julio de 1929, fecha en que se radicó el procedimiento ejecutivo, más $300 de honorarios de abogado. Repitiendo el cálculo que hizo la acreedora para computar los intereses desde el 2 de mayo hasta el 31 de diciembre de 1928([s]) inmediatamente advertiremos que la acreedora partió de la base de que los $4,000 garantizados con la hipoteca los había recibido la deudora en su totalidad el 2 de mayo de 1928, y que no dedujeron los $150 de intereses del pagaré de $3,000 que la deudora satisfizo al Banco por adelantado al recibir el préstamo. Tampoco tuvieron presente que la totalidad de los $620.18 importe de los cheques relacionados en la nota 5, no fué recibida por la deudora el día 2 de mayo de 1928. De los cheques resulta que la deudora recibió $50 el 31 de julio de 1928, $365.18 en distintas partidas en el mes de agosto y $205 en varios días del mes de septiembre de 1928. Siendo ello así, ¿cómo podía la acreedora cobrar intereses desde el mes de mayo sobre estos $620.18 que entregó varios meses después de esa fecha? El error al calcular los intereses sobre los $620.18 desde el 2 de mayo de 1928 hasta diciembre 31 de 1928 necesariamente tuvo por resultado que la acreedora cobró intereses que no se le adeudaban y esa cir-

---

([s])Los intereses sobre $4,000 al 10 por ciento anual desde el 2 de mayo de 1928 hasta el 31 de diciembre de 1928, es decir, 7 meses 29 días, importan a $265.50. Se observará que la acreedora erró en $4.50 al calcular estos intereses y así lo admitió en su alegato.

cunstancia bastaría también para sostener la conclusión de la corte anulando el procedimiento ejecutivo. *Torres* v. *Fernández, supra; Figueroa* v. *Boneta, supra; Vázquez vda. McCormick* v. *Gutiérrez, supra; Martorell* v. *Crédito y Ahorro Ponceño, supra* y *Santos* v. *Crédito y Ahorro Ponceño,* supra.

## II

Pero los demandados alegaron ciertas defensas y debemos discutirlas. La primera es que el demandado Jorge Llinás Morell adquirió la finca por prescripción por haberla poseído en carácter de dueño, pública, pacíficamente y sin interrupción desde el 11 de septiembre de 1929, sin haberse ausentado de la isla de Puerto Rico. Siendo ello así, como la demanda solicitando la nulidad del procedimiento ejecutivo fué radicada el 7 de agosto de 1941, habían transcurrido en esa fecha cerca de doce años desde que el demandado empezó a poseer la finca. Como su posesión fué pública, pacífica, ininterrumpida y con justo título,[9] ese lapso de tiempo hubiera sido suficiente para adquirirla por prescripción ordinaria si hubiera existido buena fe. Pero en el presente caso no existió buena fe por parte de los demandados. El propio Jorge Llinás declaró que cuando se otorgó la escritura de hipoteca actuaba él como gestor de la acreedora y que más tarde fué tal socio y estuvo perfectamente enterado de los negocios de G. Llinás & Co., con Amelia Costas Ferrer hasta que la finca le fué adjudicada. Consideradas estas circunstancias no erró la corte inferior al desestimar la defensa de prescripción.

---

[9] La escritura de venta judicial otorgada por el márshal constituyó justo título porque dicha escritura legalmente bastaba para transferir el dominio de la finca—art. 1852, Código Civil, ed. 1930. También dicho título es verdadero y válido (Art. 1853, Código Civil) porque no se trataba en este caso de una venta simulada y por no ser nula la escritura por falta de capacidad en el márshal. o en el comprador y reunir el contrato las condiciones exigidas por el art. 1213 del Código Civil. Manresa, Comentarios al Código Civil Español, t. 12, pág. 839 *et seq.*

 La segunda defensa, o sea la de que el demandado Jorge Llinás desconocía los defectos de su título y por consiguiente es un tercero dentro de las disposiciones de la Ley Hipotecaria y del Código Civil de Puerto Rico, ha sido ya discutida al considerar la primera defensa. La tercera, al efecto de que la ahora demandante ratificó y aprobó con su conducta el ejecutivo sumario, es también insostenible. El hecho de que la demandante no impidiese a Jorge Llinás, después de habérsele adjudicado la finca, hacer abonos a la hipoteca del Federal Land Bank of Baltimore; el no haber pagado ella cantidad alguna después de haber perdido la finca y el hecho de que la demandante para evitar que G. Llinás & Co., S. en C., siguiese persiguiendo otros bienes de ella para recobrar el déficit de la sentencia transfiriese a Jorge Llinás el certificado de 75 acciones del Federal Land Bank of Baltimore que como dueña de la finca hipotecada poseía, no constituye ratificación de un procedimiento inexistente como lo fué el ejecutivo sumario. Pero en la hipótesis de que dicho procedimiento fuese ratificable, de ese sólo hecho no surge claramente la intención de ratificar. Finalmente la contención de que la acción de nulidad del procedimiento ejecutivo está prescrita por haber transcurrido más de cuatro años desde que terminó ese procedimiento no merece seria consideración. Bastará decir que no se trata de anular un contrato anulable. La acción va dirigida contra un procedimiento inexistente.

## III

 Sostenida la sentencia en cuanto anuló el procedimiento ejecutivo y ordenó la restitución de la finca con la devolución de los frutos producidos o debidos producir, corresponde ahora determinar si erró la corte a quo al fijar el valor de éstos.

Los frutos que de acuerdo con la sentencia deben devolver los demandados son los producidos por la caña de azúcar, el café y las chinas.

## Caña de Azúcar

Como producto líquido de la caña de azúcar la ahora demandante reclamó en sus demandas original y complementaria la cantidad de $40,600. La corte le concedió por este concepto $22,557.82([10]) Para obtener ese resultado la corte tuvo en cuenta las liquidaciones de caña rendidas por las centrales a Jorge Llinás ([11]) desde el año 1930–31 hasta 1943, las cuales, incluyendo $8,009.26 que Jorge Llinás recibió por concepto de pagos de beneficios bajo la Ley Costigan-Jones y la titulada "Sugar Act of 1937", ascendieron a $77,025.98. Pero como en el año 1930–31 Jorge Llinás tuvo pérdidas en la caña montantes a $1,499.44 y los gastos necesarios para la producción de ese rendimiento bruto ascendieron, según declaró probado la corte, a $52,967.72, sumando estas dos últimas cantidades, darán un total de $54,467.16, y restando ésta del beneficio bruto, o sea $77,025.98, tendremos que el producto líquido de la caña de azúcar desde 1930–31 hasta 1942–43 montó a $22,558.82. Parece pertinente aclarar que para fijar los gastos de producción en $52,967.72 la corte descansó en la declaración de Francisco Colón Moret, perito de la demandante. Los demandados atacan la conclusión de la corte sobre este punto, fundándose en que no debió dar crédito a esta declaración por estar basada en la opinión del perito sobre lo que debió costar la producción de la caña en cuestión considerando la calidad del terreno, cantidad de caña cultivada cada año, precio de jornales, abonos, etc. y no en records exactos de lo realmente gastado. El mero hecho de que el perito no pueda basarse en records exactos no hace inadmisible esa evidencia. El peso probatorio de esa declaración dependerá especialmente del crédito que a la corte merezca el perito por sus conocimientos en la materia; ([12])

---

([10]) La cantidad correcta debe ser $22,558.82.

([11]) Las liquidaciones correspondientes a los tres primeros años se expidieron a nombre de G. Llinás & Co., S. en C.

([12]) De la prueba resulta que Francisco Colón Moret se ha dedicado al cultivo de caña desde el año 1924; que ha poseído fincas de su propiedad y las ha cul-

por la oportunidad que éste tuviera para poder emitir una opinión con conocimiento de causa y por la forma en que declare. 2 Wigmore, *Evidence* (3ra. ed. 1940) sección 677. Veamos los motivos que tuvo la corte para dar entero crédito a la declaración del perito Colón Moret.

"En cuanto a la caña cosechada en la finca hemos tomado para computar tonelaje y lo pagado por ellas, exclusivamente los datos que resultan de las liquidaciones de las centrales que obran en poder del propio demandado Llinás Morell y que produjo en corte a virtud de la citación 'subpoena duces tecum' librada a petición de la parte demandante. Toda vez que dicho codemandado no presentó como evidencia los 'pay rolls' de los distintos años, las facturas de abonos y demás materiales usados en la siembra, recolección y cultivo de caña, en la consideración de los gastos necesarios para dichas atenciones descansamos en el extenso y detallado testimonio del perito Francisco Colón Moret cuya vasta experiencia profesional y estudios en la materia fué aceptada por la parte demandada. La declaración de Jorge Llinás Morell, en parte evasiva, en nada nos ayudó en este aspecto de gastos, cuando él, mejor que nadie, ha tenido que estar en conocimiento de todos los gastos y expendios necesarios en dicho cultivo. Para beneficio del propio codemandado Jorge Llinás Morell, no tomamos en consideración los gastos anuales en las plantaciones de cañas, *que bajo la solemnidad del juramento,* él informó en su Declaración de Nómina al Fondo del Seguro del Estado, en varios años, y que se comparan en los gastos dados por el perito Colón Moret en la siguiente forma:

| Año | Declaración de Llinás | Testimonio de Colón Moret | Diferencia |
|-----|-----|-----|-----|
| 1940–41 | $2,781.00 | $4,825.00 | $1,044.00 |
| 1939–40 | 1,796.58 | 6,313.51 | 4,516.92 |
| 1938–39 | 1,629.86 | 4,211.53 | 2,581.67 |
| 1937–38 | 1,631.43 | 4,711.36 | 3,079.93 |
| 1936–37 | 1,478.27 | 4,743.51 | 3,265.24 |
| 1935–36 | 2,052.39 | 3,151.75 | 1,099.36 |
| | | Total | $15,587.12 |

" * * * * * *

tivado; que ha sido Jefe de Cultivo y Consultor Agrícola de varias centrales entre ellas, Mercedita, Yabucoa, Pasto Viejo, Coloso y Lafayette; que ha estado en esas actividades durante 24 años y está familiarizado con el costo de cultivo y producción de la caña de azúcar, especialmente en zonas similares a las de la comarca donde radica la finca que motiva este pleito.

"De modo que hay una diferencia substancial de nada menos que $15,587.12, *entre los gastos dados bajo juramento* por Jorge Llinás Morell y los dados por el perito Francisco Colón Moret.

"Es curioso hacer notar que en las declaraciones de nóminas que dicho codemandado hizo para el Fondo del Seguro del Estado, ante el Notario Luis López de Victoria, *después de haber sido emplazado en este pleito de nulidad,* para el año 1942–43 (*Exhibit* 30, Dte.) para plantaciones de caña, consignó: $9,913.97, cuando en este año cultivó 58 cuerdas de *retoños* y dejó de cortar de 20 a 25 cuerdas de cañas; y para el año 1941–42 (Exhibit 31, Dte.) consignó $6,973.00 para el cultivo de *retoños;* en la declaración que bajo juramento hizo un mes antes de ser emplazado, sólo consigna $2,781.00 para esas mismas 58 cuerdas de cañas. No obstante haber hecho un gasto tan extraordinario para el año 1941–42, expuso también, *bajo juramento,* en el párrafo PRIMERO de su Contestación a la Demanda Complementaria que tuvo una ganancia de $32.86 en las cañas."

## *Café*

Por concepto de café la corte concedió a la demandante la cantidad líquida de $7,485.57 que se descompone así: $6,960.57 producto líquido del café desde 1930 hasta 1943, más $525 importe del subsidio que los agricultores de café recibieron del Gobierno durante los años 1939–41. Refiriéndose a lo producido por el café, dijo la corte inferior:

"Desde el año 1930 el codemandado Jorge Llinás Morell ha cultivado de 15 a 20 cuerdas de café en la finca, o sea un promedio de 17½ cuerdas; con el ciclón bajó la producción; en 1930 se cosecharon 15 quintales 36 libras de café; y en 1931, 39 quintales con treinta libras. (Contestación a la Demanda párrafo CUARTO, 2a. CAUSA). Luego se normalizó el rendimiento, teniendo las variaciones propias del cultivo de este producto; el rendimiento promedio en esa zona es de 3 quintales por cuerda. (Declaración de Tiburcio Lloréns) y con un cultivo especial y científico llegaría a 6 quintales por cuerda. (Declaración de Juan Adrover, perito en café, de los demandados.) El gasto promedio por quintal de café desde su cultivo hasta ponerlo en el mercado es de $8.50. (Declaración de Tiburcio Lloréns Torres, agricultor por más de 40 años en esa zona cafetalera; tuvo arrendada la finca de este pleito cuando ella perteneció a su hermano Luis Lloréns Torres, y sus fincas de café colindan con la de este pleito y por

muchos años compró sus cosechas de chinas). Lo producido o debido producir en café por dicha finca, desde el 1930 hasta el 1943, ambos años inclusive, tomando en consideración una cosecha promedio de 52.50 quintales anuales y su precio en el mercado dados por los testigos Ramiro Colón y el propio Jorge Llinás Morell, es como sigue:

| "Año | Quintales | Precio Quintal | Producido | Gastos | Beneficio |
|------|-----------|----------------|-----------|--------|-----------|
| 1930 | 15. 56 | $30. 00 | $466. 80 | $132. 26 | $334. 54 |
| 1931 | 39. 30 | 30. 00 | 1179. 00 | 434. 05 | 744. 95 |
| 1932 | 52. 50 | 17. 67 | 927. 68 | 446. 25 | 481. 43 |
| 1933 | 52. 50 | 16. 74 | 878. 85 | 446. 25 | 432. 60 |
| 1934 | 52. 50 | 18. 25 | 958. 13 | 446. 25 | 511. 88 |
| 1935 | 52. 50 | 13. 11 | 688. 28 | 446. 25 | 242. 03 |
| 1936 | 52. 50 | 14. 84 | 779. 10 | 446. 25 | 332. 85 |
| 1937 | 52. 50 | 15. 71 | 824. 78 | 446. 25 | 378. 53 |
| 1938 | 52. 50 | 17. 55 | 921. 38 | 446. 25 | 475. 13 |
| 1939 | 52. 50 | 15. 74 | 826. 35 | 446. 25 | 380. 10 |
| 1940 | 52. 50 | 18. 40 | 966. 00 | 446. 25 | 519. 75 |
| 1941 | 52. 50 | 18. 76 | 984. 90 | 446. 25 | 538. 65 |
| 1942 | 52. 50 | 23. 50 | 1233. 75 | 446. 25 | 787. 50 |
| 1943 | 52. 50 | 23. 75 | 1246. 87 | 446. 25 | 800. 63 |
| | | | | | $6960. 57 |

"Durante los años 1939, 1940 y 1941 los agricultores de café recibieron subsidios del gobierno; en el primero de esos años cinco centavos por libra cosechada; en el segundo, 3 centavos; y en el tercero, 2 centavos. El subsidio por esos tres años en total, sobre la base de una producción anual promedio de 52.50 quintales, alcanza a $525, que recibió o debió haber recibido el codemandado Jorge Llinás Morell, lo que eleva el beneficio líquido del café cosechado por él en dicha finca a $7,485.57."

### Chinas

Por concepto de chinas la corte concedió a la demandante durante los años antes mencionados la cantidad de $4,320 más $262.50 que recibió Jorge Llinás por conservación de suelos o sea $4,582.50.

Fundamentando esta conclusión la corte dijo:

"El ciclón de San Felipe hizo poco daño a la siembra de chinas de la finca. (Declaración de Tiburcio Lloréns.) Las chinas son de

buena calidad y se han vendido cuando hay buen precio para ellas, o sea de febrero en adelante; generalmente se vende el cosecho en los árboles y es por cuenta del comprador la cogida y transportación; en la limpieza y poda del chinal se ha gastado de $40 a $50 anuales; hasta el 1930 daba un promedio de 150,000 chinas; de 1930 a 1940 de 100,000; en 1940 hubo oferta de $350 por el cosecho y fué rechazada esa oferta; se venden de $3 hasta $5 millar; en 1944 se vendió por $500; las chinas de esa finca se venden en unión a las de otra colindante que posee la mercantil G. Llinás y Compañía, S. en C., que representa una sexta parte de la cosecha de ambas fincas; es decir, las de la finca de este pleito rinden cinco sextas partes y la otra una sexta parte (declaraciones de Tiburcio Lloréns, Jorge Llinás Morell y Marcelino Anadón). Las chinas de la finca de este caso sin incluir las de la otra finca dieron en 1944 un rendimiento líquido de $288, luego de descontar el gasto anual en limpieza y poda (declaración de Jorge Llinás Morell) desde el 1930 hasta marzo de 1944, han dado o debido dar un rendimiento líquido de $4,320.

"Por conservación de suelos el codemandado Jorge Llinás Morell ha recibido dentro del programa 'Agricultural Conservation Program', la suma de $262.50. (Contestación a la Demanda, párrafo SÉPTIMO (e), 1ra. CAUSA DE ACCIÓN)''.

A nuestro juicio no erró la corte a quo al conceder a la demandante $22,558.82 por concepto de caña de azúcar, $7,485.57 por café y $4,582.50 por chinas. Todo ello totaliza $34,626.89. Empero la corte inferior, al sumar las tres partidas concedidas por concepto de frutos, expresó que totalizaban $35,884.67, cuando en realidad ascienden a $34,626.89. Siendo ello así, la conclusión de la corte sobre este punto debe modificarse en consecuencia.

## IV

■ Como al anularse el procedimiento ejecutivo se restablece el crédito hipotecario, veamos en primer término qué cantidad adeuda la demandante a la demandada G. Llinás & Co., S. en C.:

Por concepto de capital_____ $3,620.18
Intereses al 10 por ciento anual sobre $3,000 desde noviembre 1ro. hasta diciembre 1ro., 1928_____ 50.00

Intereses sobre las cantidades representadas por los 10
cheques a razón de 10 por ciento desde que fueron res-
pectivamente entregados a la demandante hasta el 31
de diciembre de 1928_____ 20. 90

Intereses al 10 por ciento sobre el capital prestado o sea
$3,620.18 desde el 1ro. de enero de 1929 hasta la fecha
de la sentencia el 16 de marzo de 1945, o sea 16 años,
2 meses y 15 días_____ 5, 867. 73

Total adeudado por la demandante a G. Llinás & Co., S.
en C., por concepto de capital e intereses_____ $9, 558. 81

Y como el que recibe los frutos producidos por un po-
seedor, aunque éste lo sea de mala fe, debe reembolsar los
gastos necesarios para producirlos, art. 382, Código Civil,
así como los de conservación de la cosa poseída, art. 384,
Código Civil, procederemos a determinar lo que por ambos
conceptos la demandante viene obligada a pagar al poseedor
Jorge Llinás Morell:

Por concepto de contribuciones pagadas sobre la finca____ $1, 877. 36

Por capital e intereses pagados sobre la hipoteca de $7,500
al Federal Land Bank of Baltimore hasta el 25 de oc-
tubre de 1945_____ 7, 617. 26

Por gastos en construcción de caminos para la finca_____ 3, 170. 60

Total adeudado por la demandante a Jorge Llinás Morell $12, 665. 22

Como la demandante tiene derecho a recibir de los deman-
dados solidariamente la cantidad de $34,626.89 y éstos deben
recibir de ella la cantidad de $22,224.03—o sea $9,558.81 G.
Llinás & Co., S. en C., y $12,665.22 Jorge Llinás—deducidas
estas cantidades la demandante deberá recibir de los deman-
dados la cantidad de $12,402.86.

## V

 Arguyen también los demandados que la corte infe-
rior declaró nulo el pacto de anatocismo, es decir el de pagar
intereses de intereses, además de que los condenase a pagar
honorarios de abogado por la cantidad de $5,000.

En la demanda se alegó que G. Llinás & Co., S. en C., es una sociedad mercantil y ese hecho fué expresamente aceptado en la contestación. Establecido que la demandada G. Llinás & Co., S. en C., es una sociedad mercantil, el préstamo que ésta hizo a la demandante es de carácter mercantil a tenor con el art. 229 del Código de Comercio, que en lo pertinente prescribe:

"Art. 229.—Se reputará mercantil el préstamo, concurriendo las circunstancias siguientes:

"1. Si alguno de los contratantes fuere comerciante.

"2. . . . . . ."

Siendo mercantil el préstamo que G. Llinás & Co., S. en C., hizo a la demandante, es de aplicación al mismo el art. 235 del Código de Comercio que dice así:

"Art. 235.—Los intereses vencidos y no pagados no devengarán intereses. *Los contratantes* podrán, sin embargo, capitalizar los intereses líquidos y no satisfechos, que, como aumento de capital, devengarán nuevos réditos." (Bastardillas nuestras).

Pero como en el presente caso los contratantes en ningún momento han capitalizado los intereses líquidos y no satisfechos, tenemos que concluir que la corte inferior actuó correctamente al no conceder a la acreedora intereses de intereses.

Los demandados también señalan como error el habérseles condenado a pagar $5,000 por concepto de honorarios de abogado. Del récord resulta que el abogado de la demandante condujo su caso con notable habilidad y sus actuaciones durante el curso del juicio revelan que hizo un cuidadoso estudio de las cuestiones envueltas. Pero considerada la naturaleza de las cuestiones suscitadas y todas las circunstancias concurrentes, opinamos que esta partida debe reducirse a la cantidad de $2,500 que nos parece razonable (13)

---

(13) Los demandados señalan otros errores, entre ellos el de que las cantidades recibidas por razón de subsidios pertenecen a Jorge Llinás y no a la demandante, a pesar de que se resuelva que él es un poseedor de mala fe, errores que no discutiremos por entender que carecen de mérito, y de discutirlos, extenderíamos innecesariamente esta opinión.

## VI

█ La demandante a su vez señala como error el no haber condenado la corte a los demandados al pago de daños triples. Basa su contención en que una vez adjudicada la finca al demandado Jorge Llinás Morell, éste tomó posesión de ella sin que la corte hubiese expedido una orden de posesión dirigida al márshal. En efecto, la evidencia demuestra que no se expidió tal orden, pero ello no obstante, el márshal, aunque sin autorización legal, fué con dicho demandado a la finca y le hizo entrega de la misma. Invoca la demandante el art. 281 del Código de Enjuiciamiento Civil, ([14]) pero ese precepto legal no es de aplicación al presente caso. El referido artículo confiere a la corte de instancia la facultad discrecional de imponer la penalidad de daños triples cuando el demandado causa daños por razón de ocupación violenta o de usurpación de algún edificio o cualquier predio cultivado. *Gwinn* v. *Goldman,* 134 P.2d 915 (Cal. 1943); *San Francisco & Suburban Home Bldg. Society* v. *Leonard,* 119 Pac. 405 (Cal. 1911); 12 *Cal. Jur.* 629, sección 32. Ya hemos visto que el demandado pacíficamente tomó posesión de la finca y no aparece del récord que ni siquiera haya sido molestado en el disfrute de la misma hasta que se radicó este pleito para anular el procedimiento ejecutivo. Dentro de las circunstancias concurrentes no podemos convenir en que la corte a quo hiciera mal uso de su discreción al negarse a conceder tales daños.

█ Señala también como error la demandante el haber la corte concedido intereses sobre las cantidades representadas por los 10 cheques desde sus respectivas fechas. Descansa su tesis en que, según ella, los $620.18 no constituían

---

([14])El art. 281, idéntico al 735 del Código de Enjuiciamiento Civil de California, dice así:

"Si una persona reclamare daños y perjuicios por razón de ocupación violenta o de usurpación de algún edificio o de cualquier predio cultivado, podrá obtener una sentencia por el triple del importe de los daños verdaderos que aquélla determine".

una cantidad líquida y por consiguiente no devengaban interés hasta la fecha de la sentencia que decretó la nulidad del procedimiento ejecutivo. No tiene razón la demandante. Ella se obligó a pagar intereses sobre la parte de la deuda dedicada a refacción lo mismo que sobre los $3,000 con que había de satisfacerse el pagaré. Si en vez de entregarle los $620.18 en distintas partidas, la demandante hubiera recibido un cheque por $620.18 el 2 de mayo de 1928, no pretendería que esa cantidad constituía una deuda ilíquida, y por lo tanto, que no devengaba intereses. La circunstancia de haberse entregado en distintas partidas no hacen menos ciertas dichas cantidades, las cuales devengan el interés convenido desde que respectivamente fueron recibidas. Las decisiones citadas por la demandante en apoyo de su tesis se refieren a casos de daños y perjuicios en los cuales la suma a pagar por el demandado no quedó fijada hasta que la corte dictó sentencia determinando el montante de los daños.

 Señala además, como error, la demandante, la concesión de intereses a la demandada hasta la fecha de la sentencia y el no haber concedido frutos a la demandante antes de 1930-31 ni con posterioridad al año 1943. De acuerdo con el art. 384 del Código Civil, el poseedor de mala fe abonará los frutos percibidos y los que el poseedor legítimo hubiera podido percibir;(15) pero, tanto los unos como los otros, deben ser objeto de prueba y en el presente caso la demandante se limitó a probar los frutos percibidos desde 1930-31 hasta el 1943 y no encontramos que haya presentado evidencia de los percibidos o podidos percibir con anteriori-

---

(15) El concepto de *frutos podidos percibir* lo explica Manresa en los siguientes términos:

"Los *podidos percibir*, son los que debiera haber producido la cosa. Según Goyena, al comentar el art. 431 del proyecto de Código de 1851, comprendía dicha palabra tanto los frutos que el propietario o poseedor de mejor derecho hubiera podido hacer producir a la cosa, como los que pudo aprovechar el poseedor vencido, aunque no hubiera podido percibirlos el propietario. El artículo 455 del Código vigente no va tan allá. Sólo habla de los frutos que el poseedor legítimo, o sea el poseedor de mejor derecho vencedor en el juicio, hubiera podido percibir si hubiera estado la cosa en su poder. De notar es que dicho ar-

dad al año 1930–31 y con posterioridad al 1943. El caso de *Pontón* v. *Sucrs. de Huertas González,* 46 D.P.R. 789 contempla circunstancias extraordinarias de equidad que no concurren en el presente caso. Allí los demadantes pidieron que se anulara el procedimiento ejecutivo hipotecario seguido contra ellos por los demandados y que se les devolviese el valor de la finca adjudicada, pero no solicitaron pronunciamiento alguno por concepto de frutos percibidos o podidos percibir. De la prueba resultó que el capital de la hipoteca era $4,500 y que los demandados con posterioridad a la adjudicación de la finca, la vendieron por $8,500 e inmediatamente empezaron a disfrutar de los beneficios de esa cantidad. Resolviendo las reconvenciones de los demandados, dijo este Tribunal:

"No hay duda alguna de que anulado el ejecutivo hipotecario queda subsistente el crédito asegurado con la hipoteca. Que los demandados tienen derecho a recobrar los $4,500 que prestaron a los demandantes una vez que les reintegren el valor de la finca ya que ésta no puede devolverse, es evidente. Lo que sí creemos que no tienen derecho a percibir son las costas y honorarios de abogado, ni los intereses, ya que no es posible dejar de tomar en consideración que los honorarios se devengaron en un procedimiento nulo y que la finca pasó a sus manos indebidamente y la vendieron por $8,500, de cuya cantidad han venido beneficiándose desde que la percibieron. De acordarles tal derecho se les estaría reconociendo un doble beneficio ya que sólo se les condena al reintegro del valor de la finca sin frutos o intereses. El pronunciamiento debe quedar redactado reconociendo a los demandados el derecho a cobrar de los demandantes $4,500 que los demandados descontarán de los $8,500 que deben satisfacer a los demandantes." (págs. 797–8).

---

tículo habla de frutos podidos percibir y no podidos producir, lo cual podrá ser lo mismo, pero comunica cierta generalidad al precepto, haciéndole aplicable lo mismo a los frutos naturales que a los civiles. Las rentas, pensiones e intereses que por negligencia del poseedor no pueden ya reclamarse, son indudablemente frutos podidos percibir. Los frutos perdidos por culpa del mismo antes de percibirse, son también podidos percibir. Lo mismo si sembró diez debiendo sembrar veinte, si percibió quince siendo treinta el producto medio de la cosecha en un año dado, etc. Para que puedan llamarse los frutos podidos percibir, ha de mediar culpa, abandono o negligencia en el poseedor." (Manresa, Comentarios al Código Civil Español, t. 4, págs. 259 y 260).

Y en *Crespo* v. *Schluter*, 58 D.P.R. 834, también invocado por la demandante, este Tribunal entendió que la situación era semejante a la del caso de *Pontón*, supra, y aplicó la misma doctrina con respecto a intereses.

En el presente caso la demandante reclamó frutos y presentó evidencia en apoyo de su reclamación, pero por razones que no constan del récord, no tuvo a bien reclamar los percibidos o podidos percibir antes del 1930–31, ni después de 1943. No vemos razón alguna para impedir a los demandados que obtengan el pago de los intereses del capital adeudado desde que fué entregado hasta la fecha de la sentencia.

## VII

Procede ahora considerar el recurso de apelación que contra la resolución aprobatoria del memorándum de costas radicó la demandante. Dicha apelación se circunscribe a aquella parte de la resolución que negó por completo la partida de $500 reclamada por concepto de honorarios del perito Francisco Colón Moret, por su asistencia a la corte durante tres días como perito de la demandante. Se invoca el caso de *Durán* v. *Sucn. Durán*, 55 D.P.R. 633. En efecto resolvimos allí que no erró la corte inferior al aprobar una partida de $100 por concepto de honorarios de un perito calígrafo. Con posterioridad al caso de *Durán*, supra, resolvimos el de *Colón* v. *Central Cambalache*, 65 D.P.R. 156, en el cual hicimos un estudio del art. 327 del Código de Enjuiciamiento Civil,([16]) según fué enmendado por la Ley núm.

([16]) En lo pertinente el art. 327 del Código de Enjuiciamiento Civil, dice así:

"La parte a cuyo favor se dicte cualquier sentencia o resolución final le serán concedidas las costas, las cuales comprenderán los siguientes desembolsos:

"1. Cualquier cantidad pagada al secretario de la corte o a cualquier márshal de distrito;

"2. Lo desembolsado por copias auténticas de escrituras y certificaciones del registro de la propiedad o de *cualesquiera* otros records oficiales, que hayan sido admitidos en evidencia;

"3. Dos (2) dólares por cada testigo y por cada día de asistencia a la corte, más millaje para ida y vuelta a su residencia;

94 de 11 de mayo de 1937 (Léyes de 1936–37, pág. 239), llegando a la conclusión de que sólo tienen el concepto de costas los gastos o desembolsos claramente comprendidos en los distintos incisos del art. 327. Los peritos, como testigos que son, están comprendidos en el inciso 3 que fija en $2 su compensación por cada día de asistencia a la corte. Se observará que fuera de ese inciso, no caben los peritos en ninguno otro, pues para que pudieran considerarse comprendidos en el inciso 6 como pretende la demandante, precisaría que sus honorarios fuesen un desembolso sujeto a arancel, y no lo son. Por consiguiente, considerando al perito Colón Moret como testigo regular y habiendo él asistido a la corte durante tres días, la partida de $500 debe ser aprobada por $6 solamente.([17])

*Procede, por lo expuesto, revocar la resolución aprobatoria del memorándum de costas en la parte en que fué apelada, es decir, en cuanto denegó totalmente la partida de $500 por concepto de honorarios del perito Francisco Colón Moret, y en su lugar dictar otra resolución aprobando dicha partida por la cantidad de $6. Y en lo que a la sentencia respecta, debe modificarse en el sentido de condenar a los demandados solidariamente a pagar a la demandante la cantidad de $12,402.86 en vez de $13,659.89 y reducir a $2,500 la condena de honorarios de abogado. Así modificada se confirma.*

El Juez Asociado Sr. Snyder no intervino.

''4. Lo pagado al taquígrafo de la corte para transcripción de cualquiera prueba testifical o procedimiento habidos en corte abierta, si dicha transcripción es ordenada por la corte;

''5. Cinco (5) dólares como honorarios de notario y justo valor del trabajo taquigráfico en la toma de cualquier deposición que fuera admitida en evidencia; y

''6. Cualquier otro desembolso necesariamente hecho con relación a la tramitación del caso, que la corte crea propio, y que estuviere sujeto a arancel.''

([17]) El caso de *Durán* v. *Sucn. Durán,* 55 D.P.R. 633, debe entenderse revocado en cuanto a este punto.